1  BORIS FELDMAN, State Bar No. 128838
2  Email: boris.feldman@wsgr.com
   IGNACIO E. SALCEDA, State Bar No. 164017
3  Email: isalceda@wsgr.com
   WILSON SONSINI GOODRICH & ROSATI
4  Professional Corporation
5  650 Page Mill Road
   Palo Alto, CA 94304-1050
6  Telephone:  (650) 493-9300
7  Facsimile:   (650) 565-5100

8
   *Attorneys for Defendants Snap Inc.,*
9  *Evan Spiegel, Robert Murphy,*
   *Andrew Vollero, Imran Khan, Joanna*
10 *Coles, A.G. Lafley, Mitchell Lasky,*
   *Michael Lynton, Stanley Meresman,*
11 *Scott D. Miller, and Christopher*
   *Young*
12
13

14

15              UNITED STATES DISTRICT COURT
16              CENTRAL DISTRICT OF CALIFORNIA

17 IN RE SNAP INC.                  | Case No. 2:17-cv-03679-SVW-AGR
18 SECURITIES LITIGATION

19                                    **CLASS ACTION**

20                                    **MEMORANDUM OF POINTS
                                      AND AUTHORITES IN
21                                    SUPPORT OF SNAP
                                      DEFENDANTS' MOTION TO
22                                    DISMISS THE CONSOLIDATED
                                      COMPLAINT**
23

24                                    Date: February 26, 2018
25                                    Time: 1:30 p.m.
                                      Courtroom: 10A
26                                    Honorable Stephen V. Wilson

27 This Document Relates To: All Actions

28

1

## TABLE OF CONTENTS

2

**Page**

3

INTRODUCTION .................................................................................................1

STATEMENT OF FACTS ....................................................................................2

4

    A.    Snap's Business...................................................................................2

5

    B.    Snap's IPO and S-1 ...........................................................................2

    C.    Q1 and Q2 Results ............................................................................3

6

    D.    This Litigation ...................................................................................4

7

ARGUMENT ........................................................................................................4

I.      LEGAL STANDARDS .............................................................................4

8

    A.    Section 10(b) .....................................................................................4

9

    B.    Section 11 ..........................................................................................5

    C.    Unnamed Witnesses ..........................................................................5

10

II.     PLAINTIFFS FAIL TO STATE AN EXCHANGE ACT CLAIM ...............6

11

    A.    Plaintiffs Fail to Allege a False or Misleading Statement or
          Omission ...........................................................................................6

12

          1.    Instagram Claim.....................................................................6

13

                a.    The S-1 Disclosed Actual, Not Just Potential, Harm ......6
                b.    The Instagram Matter Was Already in the Public

14

                     Domain ......................................................................9
                c.    Plaintiffs' "Existential Threat" Thesis Fares No

15

                     Better ......................................................................10

          2.    Pompliano Claim..................................................................11

16

                a.    Existence of Pompliano Complaint..............................11
                b.    Substance of Pompliano Complaint ..............................13

17

                c.    The S-1 Need Not Credit Pompliano ...........................16

          3.    Growth Hacking Claim.........................................................17

18

          4.    Italics and Boldface Are No Substitute for Falsity
                Allegations..........................................................................18

19

    B.    Plaintiffs Fail to Allege Scienter with Particularity...........................19

20

          1.    Instagram Claim...................................................................19

          2.    Pompliano Claim..................................................................20

21

           3.    Growth Hacking Claim.........................................................21

          4.    The Complaint Otherwise Fails to Plead Scienter..................22

22

III.    PLAINTIFFS FAIL TO STATE A SECURITIES ACT CLAIM ...............24

23

    A.    Plaintiffs Fail to Allege a False or Misleading Statement or
          Omission .........................................................................................24

24

    B.    Plaintiffs Fail to Allege a Violation of SEC Regulations ..................24

    C.    The Securities Act Claim Must Be Dismissed for Lack of

25

          Damages ..........................................................................................25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Avila v. LifeLock Inc.*,
2016 U.S. Dist. LEXIS 104717 (D. Ariz. Aug. 3, 2016) ............................... 20

*Belodoff v. Netlist, Inc.*,
2009 U.S. Dist. LEXIS 39903 (C.D. Cal. Apr. 17, 2009) .............................. 25

*City of Dearborn Heights v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................... 4, 13, 20

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013), *aff'd*, 691 F. App'x
393 (9th Cir. 2017) ................................................................ 19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ............................................................. 4

*Heliotrope Gen., Inc. v. Ford Motor Co.*,
189 F.3d 971 (9th Cir. 1999) ..................................................... 12

*IBEW Local 97 Pen. Fund v. Ltd. Brands, Inc.*,
788 F. Supp. 2d 609 (S.D. Ohio 2011) ........................................... 22

*In re Accuray, Inc. Sec. Litig.*,
757 F. Supp. 2d 936 (N.D. Cal. 2010) ........................................... 22

*In re Adolor Corp. Sec. Litig.*,
616 F. Supp. 2d 551 (E.D. Pa. 2009) ............................................ 24

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93
(2d Cir. 2014) ................................................................... 12

*In re Cisco Sys., Inc. Sec. Litig.*,
2013 U.S. Dist. LEXIS 53137 (N.D. Cal. Mar. 29, 2013) .......................... 20

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ..................................................... 5

*In re Downey Sec. Litig.*,
2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..................................... 19

*In re ICG Commc'ns, Inc. Sec. Litig.*,
2006 WL 416622 (D. Colo. Feb. 7, 2006) ........................................ 21

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ............................................... 21

*In re Netflix, Inc. Sec. Litig.*,
923 F. Supp. 2d 1214 (N.D. Cal. 2013) ........................................... 25

*In re NVIDIA Corp. Sec. Litig.*,
    2010 WL 4117561 (N.D. Cal. Oct. 19, 2010) ................................................ 23

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................................... 15

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ............................................................................. 5

*In re Stac Elecs. Sec. Litig.*,
    89 F.3d 1399 (9th Cir. 1996) ......................................................................... 6, 7

*In re Syntex Corp. Sec. Litig.*,
    95 F.3d 922 (9th Cir. 1996) ............................................................................... 9

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
    2010 U.S. Dist. LEXIS 142992 (W.D. Wash. Oct. 12, 2010) ...................... 25

*In re XM Satellite Radio Holdings Sec. Litig.*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ................................................................. 9

*Karam v. Corinthian Colls., Inc.*,
    2012 U.S. Dist. LEXIS 188594 (C.D. Cal. Aug. 20, 2012) ......................... 20

*Lipton v. PathoGenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) ........................................................................... 4

*Lomingkit v. Apollo Educ. Grp. Inc.*,
    2017 WL 3172861 (D. Ariz. Jul. 26, 2017), *appeal docketed*,
    No. 17-16634 (9th Cir. Aug. 15, 2017) .................................................... 18, 19

*Luna v. Marvell Tech. Grp.*,
    2016 U.S. Dist. LEXIS 141567 (N.D. Cal. Oct. 12, 2016) ..................... 12, 13

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ........................................................................ 22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015) .................................................................................... 13

*PAR Inv. Partners, L.P. v. Aruba Networks, Inc.*,
    681 F. App'x 618 (9th Cir. 2017) ..................................................................... 7

*Pierce v. Morris*,
    2006 U.S. Dist. LEXIS 57366 (N.D. Tex. Aug. 16, 2006) ........................... 25

*Pittleman v. Impac Mortg. Holdings, Inc.*,
    2009 WL 648983 (C.D. Cal. Mar. 9, 2009), *aff'd*, 385 F. App'x
    714 (9th Cir. 2010) .......................................................................................... 23

*Plevy v. Haggerty*,
    38 F. Supp. 2d 816 (C.D. Cal. 1998) .............................................................. 11

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) .......................................................................... 22

*Rubke v. Capitol Bancorp, Ltd.*,
   551 F.3d 1156 (9th Cir. 2009)...................................................5, 9, 12, 14

*S. Ferry LP, No. 2 v. Killinger*,
   542 F.3d 776 (9th Cir. 2008)................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...............................................................................5

*Weiss v. Amkor Tech., Inc.*,
   527 F. Supp. 2d 938 (D. Ariz. 2007)....................................................20

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014)..................................................................4

*Ziemba v. Cascade Int'l, Inc.*,
   256 F.3d 1194 (11th Cir. 2001)............................................................22

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009)..........................................6, 19, 20, 22, 23

# STATUTES

15 U.S.C. § 77k(a) ................................................................................5, 24

15 U.S.C. § 77k(e) ...................................................................................25

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................4

15 U.S.C. § 78u-4(b)(2)(A) .......................................................................5

Securities Exchange Act of 1934........................................................1, 5, 24

   § 10(b) ...........................................................................................4, 5, 7, 14

   § 20(a).................................................................................................4

Securities Act of 1933 .......................................................................1, 2, 24, 25

   § 11 ........................................................................................4, 5, 8, 14, 24, 25

   § 12(a)(2) ...........................................................................................4

   § 15 .....................................................................................................4

Private Securities Litigation Reform Act of 1995 ...........................4, 16, 20

# RULES AND REGULATIONS

Rule 8 .........................................................................................................16

Rule 9(b) .................................................................................................5, 16

Rule 10b-5................................................................................................24

Rule 12(b)(6)...................................................................................................4, 5, 16

17 C.F.R. § 229.503(c) ...................................................................................24

### MISCELLANEOUS

WIKIPEDIA, "Push Notifications"..................................................................17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| Plaintiffs | Lead Plaintiff Thomas DiBiase and named Plaintiff David Steinberg |
| Complaint or Compl. | Plaintiffs' Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws |
| Snap or Company | Snap Inc. |
| Snap Defendants | Snap, Evan Spiegel, Robert Murphy, Andrew Vollero, Imran Khan, Joanna Coles, A.G. Lafley, Mitchell Lasky, Michael Lynton, Stanley Meresman, Scott D. Miller, and Christopher Young |
| Ex. _ at _ | form for citation both to exhibit to Declaration of Boris Feldman submitted herewith and to page number of exhibit according to consecutive pagination of exhibits |
| S-1 | Snap's Registration Statement on Form S-1, declared effective on March 1, 2017, including Form 424B4 Prospectus filed on March 3, 2017 (Ex. 1) |
| IPO | initial public offering |
| Exchange Act | Securities Exchange Act of 1934 |
| Securities Act | Securities Act of 1933 |
| S1:_ | form for citation to page of S-1 according to consecutive pagination of exhibits |
| S1(2/2/17):_ | form for citation to page of Snap's Registration Statement on Form S-1, filed February 2, 2017 (Ex. 2) according to consecutive pagination of exhibits |
| ¶_ | form for citation to paragraph of Complaint |
| Reform Act | Private Securities Litigation Reform Act of 1995 |
| ASC | Accounting Standards Codification of Financial Accounting Standards Board |
| SEC | U.S. Securities & Exchange Commission |
| Class Period | March 2, 2017 to August 10, 2017 (*see* ¶22) |

**INTRODUCTION**

This is a fraud case in search of a false statement. The 116-page Complaint in this case nowhere alleges a false or misleading statement or omission. The Snap Defendants therefore move to dismiss.

Plaintiffs make two challenges to the veracity of the S-1 filed in connection with Snap's IPO of March 2, 2017. Both are demonstrably meritless.

Plaintiffs first claim that the S-1 failed to disclose the actual, as opposed to potential, harm to Snap caused by competition from Instagram ("Instagram Claim"). But the S-1 makes clear that Snap disclosed the actual, already-existing – and not just potential, future – harm to Snap caused by competition from Instagram. Moreover, no further disclosure was required because the market had long since become aware of that competition and the harm it was already causing Snap.

Plaintiffs next claim that the S-1 failed to disclose the existence and substance of a complaint filed in January 2017 by Anthony Pompliano ("Pompliano Claim"). But the complaint's existence and substance were publicly known before the IPO. Plaintiffs also fail to plead that the S-1 included the alleged falsehoods challenged by Pompliano – because it did not. And Pompliano's information was long stale because his three-week tenure at Snap ended 17 months before the IPO.

Plaintiffs briefly suggest a third claim of falsity, but it is self-evidently baseless. The claim challenges the veracity of Defendants' statements in May 2017 that Snap does not engage in "growth hacking" – *i.e.*, artificial boosting of user numbers. According to Plaintiffs, those May statements were belied when Snap's CEO supposedly admitted in August 2017 that Snap does engage in growth hacking ("Growth Hacking Claim"). But the CEO's August statement does not admit to growth hacking. Instead, it criticizes *others* in the industry for growth hacking.

These pleading defects are sufficient to doom Plaintiffs' claims. In addition, the Exchange Act claims fail because of flawed scienter allegations, and the Securities Act claims fail for lack of damages. The Complaint should be dismissed.

## STATEMENT OF FACTS

### A. Snap's Business

Snap's main product is a mobile-phone camera application called Snapchat. S1:12. Snapchat enables people to communicate through short videos and images called "Snaps." *Id.* "Stories" are groups of Snaps that play in chronological order and are deleted within 24 hours. S1:13. Snap also features home-grown news coverage collated from user Snaps, as well as news and entertainment coverage via partnerships with leading news organizations. S1:13, 105-06, 114-15. Snap monetizes its user engagement by displaying paid advertisements in the application. S1:13, 38. Substantially all of Snap's revenue comes from advertising. S1:13, 29.

*Users.* Snap believes the "most reliable way to understand engagement on [its] platform" is by measuring Daily Active Users, or DAU. S1:74. This metric shows whether "people are continuing to invest their time, energy, and creativity in [Snap's] products." S1:74-75. That in turn drives Snap's advertising inventory. *Id.*

Snap defines a DAU as "a registered Snapchat user who opens the Snapchat application at least once during a defined 24-hour period." S1:61. If a user accesses the application multiple times in one day, only one DAU is counted. S1:35. Snap's quarterly DAU have grown continually since the first quarter of 2014, the first quarter for which the metric was disclosed. S1(2/2/17):250-51.

*Monetization.* In 2016, Snap recorded revenue of $404.5 million. S1:77. Revenue in the first three quarters of 2017 was $539.3 million. Ex. 3 at 259.

### B. Snap's IPO and S-1

On March 1, 2017, Snap registered its IPO. ¶93. Snap and selling stockholders offered 200,000,000 shares of Class A stock. S1:19. The stock was priced at $17 per share. *Id*. The S-1 noted that in the quarter before the IPO, Snap had 158 million DAU and revenue of $165.6 million. S1:26, 79.

The S-1 also included an abundance of negative disclosures. It stated as a fact that "increased competition" caused Snap's "flat growth": "[W]e believe that the *flat*

*growth* in the quarter [4Q16] *was primarily related to* accelerated growth in user engagement earlier in the year, diminished product performance, and *increased competition*." S1:75 (emphasis added). It stated that the competition was global and was due to competitors' launch of similar products: "[W]e also saw increased competition both domestically and internationally in 2016, as many of our competitors launched *products with similar functionality to ours*." *Id.* (emphasis added). And it expressly identified "Instagram" as one such competitor: "We face significant competition in almost every aspect of our business both domestically and internationally. This includes larger, more established companies such as . . . *Instagram*[.]" S1:32 (emphasis added). Finally, the S-1 explained that Instagram had adopted a "Stories" feature that "largely mimics [Snap's] Stories feature." *Id.*

Besides this *existing* competition, the S-1 disclosed warnings about *future* performance. Snap warned investors not to assume any particular growth trajectory from Snap's historical performance. S1:37. And it warned: "We anticipate that the growth rate of our user base will decline over time" (S1:26); "Our Daily Active Users may not continue to grow" (*id.*); and "we are unable to predict" or "control" our "ability to maintain and grow our user base and user engagement" (S1:37).

On March 2, 2017, the first day of trading, Snap's share price closed at $24.48 on the New York Stock Exchange. Ex. 4; ¶283a.

**C.   Q1 and Q2 Results**

After the market closed on May 10, 2017, Snap announced Q1 results. ¶168. Snap reported 166 million DAU, a 36% increase over the same quarter the prior year, and a 5% increase over the prior quarter. *Id.* On May 11, 2017, Snap's share price closed at $18.05, down $4.93 from the prior day's closing price. ¶169.

After the market closed on August 10, 2017, Snap announced Q2 results. ¶193. Snap reported 173 million DAU, a 21% increase over the same quarter the prior year, and a 4% increase over the prior quarter. *Id.* On August 11, 2017, Snap's share price closed at $11.83, down $1.94 from the prior day's closing price. ¶194.

1

### D. This Litigation

2      On May 16, 2017 – six days after Snap announced Q1 results – this putative

3  class action was commenced. Dkt. 1. Snap's stock price that day was $20.78 per

4  share, above the IPO price of $17. Ex. 4. Similar actions followed. On September

5  18, 2017, the litigation was consolidated. Dkt. 53.

6

<u>ARGUMENT</u>

7

## I. LEGAL STANDARDS

8      Plaintiffs allege violations of §§ 10(b) and 20(a) of the Exchange Act and §§

9  11, 12(a)(2), and 15 of the Securities Act. The primary claims are those under §

10 10(b) and § 11; the remaining claims rise or fall with those two. *Lipton v.*

11 *PathoGenesis Corp.*, 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) (failure to allege

12 10(b) claim precludes 20(a) claim); *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d

13 874, 901 n.14 (4th Cir. 2014) (failure to allege § 11 claim precludes § 15 claim).

14

### A. Section 10(b)

15     To state a § 10(b) claim, Plaintiffs must allege (i) a material misstatement or

16 omission; (ii) scienter; (iii) a connection between the misrepresentation or omission

17 and the purchase or sale of a security; (iv) reliance on the misrepresentation or

18 omission; (v) economic loss; and (vi) loss causation. *Halliburton Co. v. Erica P.*

19 *John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014). A § 10(b) complaint must satisfy not

20 only Rule 12(b)(6) but also "[Rule] 9(b) and the [Reform Act], which require that

21 the complaint plead both falsity and scienter with particularity." *City of Dearborn*

22 *Heights v. Align Tech., Inc.* ("*Align*"), 856 F.3d 605, 613 (9th Cir. 2017). Plaintiffs

23 must "specify each statement alleged to have been misleading, the reason or reasons

24 why the statement is misleading, and, if an allegation regarding the statement or

25 omission is made on information and belief, . . . state with particularity all facts on

26 which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).[1] Plaintiffs must also "state

27

28

---

[1] The Complaint makes clear that all allegations challenged by this Motion are made on information and belief. *See* Compl. p. 1 ("[Plaintiffs] allege the following upon

with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). In assessing scienter, a court must consider not only inferences favoring the plaintiff but also "plausible, nonculpable explanations for the defendant's conduct[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).

**B.  Section 11**

To state a § 11 claim, Plaintiffs must allege that the S-1 contained an "untrue statement of a material fact" or "omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading[.]" 15 U.S.C. § 77k(a). A § 11 complaint must satisfy Rule 12(b)(6) and, when "sounding in fraud," the heightened requirements of Rule 9(b). *Supra* Point I.A.; *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005). A § 11 claim "sounds in fraud" where a plaintiff relies on the same alleged misconduct as in its § 10(b) claims. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). A plaintiff's disclaimer that he is alleging fraud (*e.g.*, ¶¶301, 380) cannot be taken at face value. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012).

Here, Plaintiffs' § 11 claims sound in fraud. Underlying all of their claims is the same alleged misconduct: the S-1's asserted failure to disclose the competition from Instagram and the inaccuracies in user metrics alleged by Pompliano. *Compare* ¶¶93-160, 226-60 (§ 10(b) claims), *with* ¶¶324-79 (§ 11 claims); *see also* ¶¶39-92. Moreover, Plaintiffs allege, as part of their § 11 claim, that competition from Instagram was "known" within Snap and "directly communicated to Snap's senior management," and that Defendants "[c]onceal[ed]" Pompliano's allegations. *E.g.*, ¶¶329, 331, 335-36, 350, 352. These allegations indisputably sound in fraud.

**C.  Unnamed Witnesses**

Where a plaintiff relies on statements from unnamed witnesses, plaintiff must

_personal knowledge as to themselves and their own acts, and *upon information and belief as to all other matters.*" (emphasis added))._

satisfy two tests. First, the witnesses must be described with sufficient particularity "to establish their reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). That is, the complaint must allege "sufficient detail about a confidential witness' position within the defendant company" to demonstrate the witness's personal knowledge of the facts reported. *Id*. Second, "statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id*.

## II. PLAINTIFFS FAIL TO STATE AN EXCHANGE ACT CLAIM

### A.  Plaintiffs Fail to Allege a False or Misleading Statement or Omission

#### 1.  Instagram Claim

##### a.  The S-1 Disclosed Actual, Not Just Potential, Harm

According to Plaintiffs, Snap knew that Instagram competition actually *did* harm Snap's user growth, but merely disclosed that Instagram competition *may* cause such harm. ¶¶102-03. That is simply wrong. In fact, the S-1 disclosed that Instagram's competition *did* harm user growth. Plaintiffs can allege otherwise only by cherry-picking their preferred sentences from the document and ignoring others. But the Court must consider the S-1 as a whole, not out-of-context snippets. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) (on motion to dismiss, court should "consider[] the full text of the Prospectus, including portions which were not mentioned in the complaints").

As set forth *supra* at 2-3, the S-1 states that "increased competition" caused Snap's "flat growth": "[W]e believe that the flat growth" in Q4 "was primarily related to accelerated growth in user engagement earlier in the year, diminished product performance, and increased competition." S1:75. It states that the "increased competition" arose because competitors – including "Instagram" – "launched products with similar functionality to ours." S1:32, 75. And it explicitly calls out Instagram Stories as a specific product that mimics Snapchat's offerings. S1:32.

Given these abundant disclosures regarding existing Instagram competition, it

1  is specious to allege that the S-1 merely spoke about potential future harm (*e.g.*,

2  ¶102). Snap disclosed that its growth was *already* being slowed by "increased

3  competition." S1:75. Snap disclosed that this "increased competition" was *already*

4  global and was *already* caused by competing offerings with "similar functionality."

5  *Id.* Snap disclosed that this "increased competition" *already* included Instagram's

6  "significant competition" with Snap. S1:32. And Snap disclosed that Instagram

7  *already* had adopted a "Stories" feature that was a Snap clone. *Id.* These disclosures

8  dispose of Plaintiffs' claim. *See PAR Inv. Partners, L.P. v. Aruba Networks, Inc.*,

9  681 F. App'x 618, 619-20 (9th Cir. 2017) (10(b) claim dismissed where company

10  identified competitor and disclosed action already taken by competitor); *Stac Elecs.*,

11  89 F.3d at 1406 (10(b) claim dismissed where Microsoft competition was disclosed

12  by statements that "[a] number of competitors offer products that currently compete

13  with [Stac's] products").

14         The Complaint tries to undercut these disclosures by selectively quoting

15  sentences from the S-1 and ignoring others – a sleight-of-hand employed throughout

16  the pleading. For example, the S-1 identifies three causes of flat growth for 4Q16

17  (S1:75), but the Complaint's itemization of Snap's "false and misleading statements

18  and omissions" (¶¶226-60) simply ignores two of the three, including "increased

19  competition." Indeed, while the Complaint elsewhere quotes this S-1 passage in full

20  (¶99), it misleads in paragraph 229. That paragraph of the Complaint says: "229.

21  The Registration Statement attributed the relatively flat DAU growth in the 4Q 2016

22  as being '***primarily related to accelerated growth in user engagement earlier in the***

23  ***year***.'" (Emphasis in Complaint). By contrast, the actual S-1 passage that paragraph

24  229 is purporting to quote states that that relatively flat growth was "***primarily***

25  ***related to accelerated growth in user engagement earlier in the year, diminished***

26  ***product performance, and increased competition***." S1:75 (emphasis added). The

27  Complaint's § 10(b) allegations also ignore Snap's disclosure of the fact that

28  competitors "launched products with similar functionality to ours" (*id.*); only the §

11 allegations mention that disclosure (¶344). Finally, as shown by the competition-related disclosures mentioned above, the Complaint is flat-out wrong when it says the "only" disclosure made by Snap regarding Instagram's impact was the sentence, "'Instagram, a subsidiary of Facebook, recently introduced a 'stories' feature that largely mimics our Stories feature and may be directly competitive.'" ¶231 (quoting S1:32).[2] In fact, Snap listed Instagram among its competitors and said it believed competition was cutting into its growth. *Supra* at 2-3, 6-7. Plaintiffs cannot state an "omissions" claim by ignoring Snap's most relevant disclosures.

Regarding Snap's statement that Instagram Stories "may be directly competitive," Plaintiffs place more weight on the word "may" than it will bear. According to Plaintiffs, the word "may" conceals the harm caused by Instagram Stories. ¶¶102-04. Not so. Read in the context of Snap's above-described disclosures of harm *already* caused by Instagram's competition, the word "may" functioned not to deny past harm (*e.g.*, ¶¶102, 103, 231), but to warn of future harm. The statement at issue is in the S-1's risk disclosures. S1:26. Those disclosures inherently warn about possible adverse events in the future. Thus, the disclosures often use words indicating future potentiality, like "may" and "could." Examples abound: "Our Daily Active Users *may* not continue to grow"; "There are many factors that *could* negatively affect user retention, growth, and engagement . . . . [O]ur competitors *may* mimic our products and therefore harm our user engagement and growth . . ."; "[O]ur competitors *may* acquire and engage users at the expense of our user growth or engagement, which *may* seriously harm our business." S1:26, 32 (emphases added). Given this context, and the many disclosures of Instagram's *past* harm to Snap, no one could read the word "may" as nullifying those disclosures.

Insofar as Plaintiffs fault Snap for not stating that *Instagram Stories* – as opposed to just *Instagram* – had already harmed Snap's growth (¶94), they are

---

[2] *See also* ¶107 (citing *wrong* disclosure in effort to allege that Snap's disclosure was inadequate to warn of Instagram's competition and its effect on Snap's growth).

doubly mistaken. Snap disclosed the harm from competition by "Instagram" (S1:32, 75), and nothing in that disclosure excludes any particular Instagram feature, such as Instagram Stories. In any event, Snap expressly stated that Instagram Stories "largely mimics our Stories feature." S1:32. More disclosure was unnecessary.

### b.  The Instagram Matter Was Already in the Public Domain

Plaintiffs' Instagram claim also fails for a separate reason: By the time of the IPO, the market had already been informed that Instagram and Instagram Stories were harming Snap's growth. Defendants had no obligation to disclose information already in the public domain. *Rubke*, 551 F.3d at 1162-63 (no duty to disclose publicly available information); *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 933-34 (9th Cir. 1996) (affirming dismissal of 10(b) claim based in part on market's awareness of "the risks of competition from outsiders"); *see also In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 (D.D.C. 2007) (noting that company has "'no duty to disparage its own competitive position in the market'").

The Complaint itself concedes that the matter was in the public domain by the time of the IPO. Paragraph 76 quotes a November 2016 article whose content and reader comments showed the market's awareness that Instagram copied Snapchat's Stories and was grabbing Snap's market share. Ex. 5. The article told the market that the same "ephemerality" making Snap distinctive (¶¶75-76) was now also making Instagram Stories distinctive (¶76). The article openly concluded that Instagram had copied Snapchat Stories: "Instagram is combining the best of Snapchat and Periscope . . . . Now Direct will have an ephemeral Stories messages bar . . . . It's much like how you can send Snapchat Stories as private messages, but adds in a groups feature." Ex. 5 at 266, 268.

As the reader comments showed, the market understood two things upon the article's publication. First, it understood that Instagram Stories had copied Snapchat Stories. One reader noted: "Instagram is blatantly copying all of snapchat's original features here." *Id.* at 271. Second, it understood this copying was hurting Snap's

growth. Wrote one reader: "Goodbye Snapchat and Periscope. I think this was the last tool Instagram needed to takeover their markets." *Id.* Another stated: "They are trying to complete their takeover of Snapchat's market obviously." *Id.* All such comments dated to November-December 2016. They show that, by the time of the IPO, the market was aware of both the copying by Instagram and the consequent pressure on Snap's growth. A later article confirmed this awareness, reporting: "Instagram Stories is stealing Snapchat's users."[3] No more disclosure was needed.

### c. Plaintiffs' "Existential Threat" Thesis Fares No Better

Plaintiffs' Instagram claim also fails for a broader reason: The "fact" they claim Snap should have disclosed is no fact at all. Plaintiffs' general thesis is that Instagram Stories had "eviscerat[ed]" Snap's user growth and caused "extremely adverse and highly negative" growth (¶¶8-9), and that Snap was obliged to reveal this to the market. But that narrative is refuted by the Complaint's own allegations.

The Complaint shows that, following Instagram Stories' launch in August 2016 (¶74), Snap's DAU grew each and every quarter, from 153 million to 158 million to 166 million to 173 million. ¶¶96, 193. Moreover, the graph that allegedly depicts Instagram's mortal blow to Snap (¶105) actually shows no such thing:



Snap's growth curve is positive before and after the launch of Instagram Stories.

---

[3] *See* Josh Constine, Jan. 30, 2017, "Instagram Stories is stealing Snapchat's users," *TechCrunch* ("[T]he consensus from our sources is that [Snap's user metrics would] be higher if not for Instagram Stories, and Snapchat's long-term growth, especially internationally, will be hindered by the competition.") (Ex. 6 at 274).

The data in the Complaint thus belie Plaintiffs' thesis. Plaintiffs cannot insist that Snap should have disclosed that its user base had been "eviscerated" when it had not. Snap disclosed that Instagram was a competitive product, that it had mimicked Snapchat, and that that competition was having an impact on growth. The data on which Plaintiffs themselves rely do not support disclosures that go any further.

Even if some investors were disappointed by the DAU figures in 1Q17 and 2Q17 (*e.g.*, ¶¶170, 181-83, 201-03), that is hardly sufficient to allege fraud. Fraud requires a false or misleading statement, and nothing in the statements to which Plaintiffs point (¶¶226-60) is false or misleading. To the contrary, Snap informed investors of its past and present DAU figures. ¶¶96, 193. Snap disclosed the fact of competition generally, competition from Instagram, and Instagram Stories' mimicry of Snap's Stories feature. *Supra* at 6-7. And Snap repeatedly warned investors about future risks, including that "[w]e anticipate that the growth rate of our user base will decline over time" (S1:26) and that "Our Daily Active Users may not continue to grow" (*id.*). No more was required. Indeed, these disclosures were so detailed that they are sufficient *by themselves* to dispose of any claim that Snap masked actual harm as potential harm. *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) (given company's "abundant and specific" risk disclosures, investors "cannot be heard to complain that the risks were masked as mere contingencies.").

### 2. Pompliano Claim

Plaintiffs next argue that the S-1 was misleading because it did not disclose the "existence and substance" of Pompliano's state-court complaint. ¶242. That complaint is baseless, as Snap's pleadings in the case make clear. But, even assuming *arguendo* that Pompliano's allegations are true, Plaintiffs' argument fails because the "existence and substance" were publicly known before the IPO, and Plaintiffs' ASC 450 claims are baseless.

### a. Existence of Pompliano Complaint

***Existence of Complaint Was in Public Domain.*** The Pompliano complaint's

existence was publicly known before the S-1 was filed. It was publicly filed on January 4, 2017. *See* Ex. 7. While some allegations were redacted, many others – along with the caption and the parties' identities – were not. *Id.* Furthermore, the Pompliano complaint's existence was reported in the press before the S-1 was filed. Plaintiffs themselves (¶158) cite a *Business Insider* article dated January 5, 2017 that discloses the lawsuit and reproduces the whole redacted complaint – with the first page visible – within the article: "A former Snapchat employee is accusing the company of lying to investors as it pursues its plans to go public. In a lawsuit filed in California on Wednesday, former growth lead Anthony Pompliano alleges that the company has been 'falsely misrepresenting' itself . . . . [Y]ou can read Pompliano's full court filing below." Ex. 8 at 315.[4] Many other articles pre-dating the S-1 reported the lawsuit's existence. *E.g.*, Exs. 10-14. The public filing and press articles leave no doubt that the existence of the Pompliano complaint was in the public domain prior to the IPO and thus did not need to be disclosed. *See Rubke*, 551 F.3d at 1162-63; *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576-77 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014); *see also Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999).

***ASC 450 Claims Fail.*** Plaintiffs nonetheless claim the Pompliano complaint should have been disclosed under GAAP accounting guidelines. That argument also fails. The standard they cite, ASC 450 (¶115), provides accounting guidance for disclosure of certain loss contingencies. ASC 450 requires disclosure if a financial loss is "'reasonably possible'" (*id.*), but it does not apply "to immaterial items," ASC 105-10-05-6, and an item is only "material" if the reasonably possible loss is a certain size.[5] Moreover, GAAP "'tolerates a range of reasonable treatments, leaving the choice among alternatives to management.'" *Luna v. Marvell Tech. Grp.*, 2016

---

[4] *See also* ¶11 ("the lawsuit was reported in the press").

[5] In assessing materiality, a company should consider quantitative factors such as "size in numerical or percentage terms[.]" SEC Staff Accounting Bulletin No. 99 –

1    U.S. Dist. LEXIS 141567, at *15-16 (N.D. Cal. Oct. 12, 2016).

2    In light of these standards, it is clear that Plaintiffs' claim under ASC 450

3    lacks any substance. Plaintiffs do not allege that the reasonably possible financial

4    damages from Pompliano's lawsuit – a lawsuit by an at-will employee terminated

5    after only three weeks (¶¶11, 156) – would be material considering Snap's $404.5

6    million in 2016 revenue. S1:77. More to the point, Plaintiffs offer no substantive

7    allegation indicating that Snap's or its auditors' assessment of whether loss was

8    "reasonably possible" fell outside "the range of reasonable treatments" left to

9    management. *See Luna*, 2016 U.S. LEXIS 141567, at *15-16. They therefore fail to

10   state a claim based on ASC 450.

11   Furthermore, Snap's GAAP assessment is an opinion statement, and the

12   Supreme Court and Ninth Circuit have held that a falsity challenge to such an

13   opinion must be pled with particularity. *Align*, 856 F.3d at 613-19 (falsity of opinion

14   must be pled with particularity under §§ 10(b) and 11) (citing *Omnicare, Inc. v.*

15   *Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1323-26

16   (2015)). In *Align*, the Ninth Circuit held that a company's assessment of "whether

17   goodwill impairment is 'more likely than not'" was an opinion. *Id.* at 613-14, 617.

18   Because plaintiffs failed to "plead the exact assumptions that [the company] used"

19   in its assessment, the pleading was deficient. *Id.* at 618. Here, too, Snap's

20   assessment under ASC 450 is management's opinion. Plaintiffs were thus required

21   to "plead the exact assumptions that [Snap] used" in its assessment. *See id.* They did

22   not do so. The Complaint does not show that the decision not to disclose was

23   anything other than a "'permissible business judgment.'" *Luna*, 2016 U.S. Dist.

24   LEXIS 141567, at *21.

25   **b.  Substance of Pompliano Complaint**

26   ***Substance of Complaint Was in Public Domain.***  The *substance* of the

27

28   Materiality (August 12, 1999) (noting that a 5% threshold "may provide the basis
     for a preliminary assumption" that an item is "unlikely to be material.").

Pompliano complaint was also in the public domain before the S-1. Plaintiffs complain both that the S-1 failed to disclose Pompliano's allegations that "Snap's User Metrics were Unreliable," and that Snap should have disclosed "the nature of his claims." Compl. p. 70; ¶245. But both Pompliano's allegations that "Snap's User Metrics were Unreliable" and "the nature of his claims" had been blasted around the world long before the IPO. Snap's motion to compel arbitration, which was publicly filed on January 18, 2017, twice disclosed that substance. Ex. 9 at 323 (Pompliano complaint included "allegations about Snap giving investors false user metrics back in 2015"); *id.* at 325 (Pompliano complaint alleged "that Snap was telling investors in mid-2015 that it had obtained a certain number of users, when its own internal metrics were showing a slightly lower figure"). Meanwhile, in January 2017, several articles disclosed the same substance. *Bloomberg* stated: "Snap Inc. was sued by a former employee who says the company . . . was inflating growth metrics ahead of a planned [IPO]." Ex. 10. *Forbes* added: "In a lawsuit filed in the Los Angeles County Superior Court on Wednesday, Anthony Pompliano . . . said the company inflated key growth metrics as it was recruiting him from Facebook. Pompliano also said Snapchat . . . shared the inflated metrics with some investors . . . in an effort to bolster its standing ahead of a planned [IPO]." Ex. 11. *See also* Exs. 12-14. Nor can Plaintiffs argue that, while the allegation of inaccurate metrics was public, the examples alleged by Pompliano (¶¶69-70) were not. An allegation of inaccuracy in "user metrics" is broader than, and thus subsumes, any alleged example of an inaccurate metric.

Thus, the Pompliano complaint's substance – allegations of inaccuracies in Snap's "user metrics," "growth metrics," and "number of users" – was public before the S-1 was filed. No more disclosure was required. *Rubke*, 551 F.3d at 1162-63.

**False Statements Alleged by Pompliano Not in S-1.** Plaintiffs separately note that Pompliano alleged that Defendants made false statements concerning Snap's user metrics in 2015. But the alleged false statements to which they point were not

1    included in the S-1 or otherwise made during the Class Period, and Plaintiffs do not

2    allege otherwise. These Pompliano allegations are thus irrelevant. *In re REMEC Inc.*

3    *Sec. Litig.*, 702 F. Supp. 2d 1202, 1222-23 (S.D. Cal. 2010) ("A defendant may be

4    held liable . . . only for the statements made during the class period.").

5         First, Pompliano alleged that Snap's DAU figures for the pre-June 2015

6    period were incorrect. But Plaintiffs concede that Snap restated the figures and that

7    the S-1 included the restated figures. ¶¶13, 238, 261.

8         Second, Pompliano alleged that Snap's registration flow completion rate was

9    inaccurate in 2015. ¶¶70, 144, 149. But Plaintiffs do not allege that any statement

10   made in the S-1, or otherwise during the Class Period, mentioned this metric.

11        Third, Pompliano alleged that Snap's user retention rate was inaccurate in

12   2015. ¶¶70, 144, 149. But neither the S-1 nor any other Class-Period statement is

13   alleged by Plaintiffs to have mentioned the user retention rate.

14        Fourth, Pompliano alleged that Snap claimed to have 100 million DAU at a

15   time – in September 2015 – when, according to Pompliano's calculations, Snap had

16   no more than 95-97 million DAU. ¶142. But the S-1 discloses that Snap, for 3Q15

17   (*i.e.*, July-Sept 2015), had quarterly average DAU of only 94 million.[6] S1:76; ¶227.

18   That is, the S-1 disclosed a DAU figure that was *lower* than Pompliano's figure.[7]

19   And the first quarter for which the S-1 discloses a DAU figure of 100 million

20   occurred *after* Pompliano left Snap. S1:76; ¶227.

21        Fifth, Pompliano alleged that Snap claimed to have a double-digit month-

22   over-month figure for the rate of DAU growth. ¶¶69, 136, 139, 143. But a double-

23   digit month-over-month growth rate for DAU is not included in the S-1 or in any

24   _____

25   [6] For prior quarters, the S-1 discloses even lower DAU figures. S1:76; ¶227.

     [7] The S-1 mentioned that, while Snap calculates quarterly DAU based on average
26   DAU for the *entire quarter*, Snap's competitors calculate it based on average DAU
     for the *last month of the quarter*. S1:77. Thus, it is the *competitors'* calculations that
27   omit earlier (lower) figures in the quarter and arguably overstate the quarterly DAU
     figure. While, for comparison purposes only, the S-1 set forth its DAU figures using
28   the competitors' method – which resulted in a figure of 99 million DAU for
     September 2015 – the S-1 made clear that Snap *rejects* the competitors' method. *Id.*

1    other Class-Period statement. The S-1 discloses year-over-year growth rates, *see*

2    S1:76; ¶227, but it does not mention month-over-month growth rates at all. In sum,

3    no actionable statement concerning any of these metrics is alleged by Plaintiffs.

### c.  The S-1 Need Not Credit Pompliano

5    Finally, Plaintiffs call the S-1 misleading because it does not state that Snap's

6    restatement of the DAU figures for the pre-June 2015 period was "prompted" by

7    Pompliano. ¶113. This challenge fails on two grounds.

8    First, Plaintiffs' premise – that the restatement was prompted by Pompliano –

9    lacks the particularized allegations required by the Reform Act and Rule 9(b). *Supra*

10   Point I.A. Because a dismissal motion cannot rely on facts outside the Complaint,

11   Defendants do not here contend (although they could) that the restatement occurred

12   *before Pompliano ever worked at Snap*. Even within the bounds of Rule 12(b)(6),

13   Plaintiffs' premise fails because Plaintiffs do not allege that Pompliano was in a

14   position to know whether Snap had already made the restatement – for example, in

15   presentations to investors. Indeed, Plaintiffs themselves allege that Snap was

16   "siloed" and that, except for top management, employees in one group had no

17   meaningful information about other employees' work. ¶58. That allegation negates

18   any inference that Pompliano, whose job concerned user growth (¶¶11, 36, 67),

19   knew whether representations to investors included correct DAU figures. Absent

20   any allegation that Pompliano was in a position to know whether Snap was already

21   providing restated figures, the claim that he "prompted" a correction does not even

22   meet Rule 8 pleading standards, much less the higher standard applicable here.

23   Second, the asserted fact that Pompliano "prompted" Snap's restatement of

24   the DAU figures is irrelevant to whether the S-1 was truthful. The S-1 excluded the

25   metrics alleged by Pompliano to be false. ¶¶236-40; *supra* at 14-16. That exclusion

26   demonstrates the truthfulness, not the falsity, of the S-1. Given that exclusion,

27   Plaintiffs make no sense when they allege that, by not crediting Pompliano, the S-1

28   somehow understated the risk of inaccuracy in Snap's metrics. ¶¶236-40.

### 3. Growth Hacking Claim

The Growth Hacking Claim is likewise unsupported by particularized allegations. According to Plaintiffs, Defendants' statements in May 2017 that Snap does not engage in "growth hacking" were proved false by the CEO's supposed statement in August 2017 that Snap does engage in "growth hacking." ¶¶253, 259; *see* ¶221. But the CEO's August 2017 statement says nothing of the sort.

Two terms are relevant here: "push notification" and "growth hacking." A "push notification" is simply a notification pushed from a company's server to the user interface. *See* "Push Notifications," WIKIPEDIA. "Growth hacking," by contrast, occurs when an internet company sends a user "push notifications" concerning content that is not highly relevant to the user, for the purpose of inducing the user to open the company's app and artificially inflate user numbers. ¶¶15, 179a, 186, 199.[8] Absent such indicia, a "push notification" is not "growth hacking."

In a conference call on May 10, 2017, analysts asked CEO Evan Spiegel why Snap's DAU growth was lower than expected. ¶¶177-79a. In response, Spiegel differentiated Snap from others in the industry that engage in "growth hacking, where you send a lot of push notifications to users, or you try to get them to do things that might be unnatural[.]" ¶179a. Spiegel also noted that growth hacking techniques are not "very sustainable over the long term" and "can ultimately impact our relationship with the customer." *Id.* Similarly, in a conference call on May 24, 2017, Imran Khan stated, "[W]e don't do anything to do growth hacking. We don't spam you all the time to add you as a net user." ¶186.

In a conference call on August 10, 2017, an analyst noted that Snap sends some push notifications and then asked Spiegel: If sending push notifications is not growth hacking, then "what are *others* doing that you consider to be growth hacking and not real DAU growth?" ¶199 (emphasis added). In response, Spiegel first stated

---

[8] The Complaint's numbering is off. Following paragraph 179 are paragraphs "160" and then "180." For clarity, we refer to that paragraph "160" as paragraph "179a."

that the "most important thing for [Snap]" is that Snap notifies users of content "highly relevant" to the user. *Id.* Spiegel then stated that "people, as they become more reliant on push notifications, have sort of relaxed the standards there, and I think it's important for our business." *Id.*

Plaintiffs incorrectly read this comment as an admission that Snap engages in growth hacking and that growth hacking is important to Snap's business. ¶¶221, 253, 259. Context makes clear that Spiegel made no such admission. As in the May 10 call, Spiegel's August 10 comment differentiated Snap from others in the industry. Spiegel stated: (1) what is "important" for Snap is that, unlike Snap's competitors, Snap notifies users of "highly relevant" content, but (2) other "people" in the industry (the "others" referred to in the analyst's question) have become increasingly "reliant" on "push notifications" to drive user numbers and therefore have "relaxed" the relevance "standards" for those notifications. ¶199. Returning to his opening comment about what is "important" for Snap, Spiegel concluded that "it[]" – *i.e.*, notifying users of highly relevant content and thereby differentiating Snap from competitors – is "important" for Snap's business. *Id.*

In short, Plaintiff's Growth Hacking Claim rests on a misreading of Spiegel's August 10 comment. Even if Plaintiffs tenuously argue, as a fallback, that the words "people" and "it[]" are ambiguous, ambiguities do not satisfy the Reform Act's requirement of particularized factual allegations.

### 4. Italics and Boldface Are No Substitute for Falsity Allegations

Failing to allege falsity, Plaintiffs unavailingly rely on typeface. That is, Plaintiffs italicize and boldface certain portions of the S-1 and investor calls as if to suggest that the emphasized portions are somehow misleading. *E.g.*, ¶¶12, 99, 100, 102-03, 107, 110, 117, 199, 223, 230-31, 237, 245, 247. But any such suggestion fails because Plaintiffs offer no substantive basis for concluding that those statements are in fact misleading. *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 3172861, at *8 (D. Ariz. Jul. 26, 2017) ("Plaintiffs provide no explanation why

these statements – especially the bolded and italicized sentence – are misleading beyond an allegation that the statement 'omitted material facts.'"), *appeal docketed*, No. 17-16634 (9th Cir. Aug. 15, 2017).

## B. Plaintiffs Fail to Allege Scienter with Particularity

### 1. Instagram Claim

Plaintiffs' allegations regarding the Instagram Claim fail to raise a strong inference of scienter. The only such allegations that even arguably relate to scienter are those concerning two unnamed witnesses ("FE1" and "FE2"). ¶¶37-38, 79-83, 232. But the FE1 and FE2 allegations do not satisfy the Reform Act's heightened requirements for scienter pleading, *supra* Point I.A., C, as set forth in *Zucco*:

**FE1.** The FE1 allegations fail the first *Zucco* test, which requires detailed allegations establishing the unnamed witness's reliability and personal knowledge. *Supra* Point I.C. The Complaint does not allege with particularity that FE1 worked at Snap during the Class Period, which began with the IPO on March 2, 2017. Although the Complaint alleges that FE1 worked at Snap until "early-2017" and "in the first quarter of 2017" (¶¶37, 79), these allegations are insufficient to establish that FE1 worked at Snap on or after March 2, 2017.[9]

Nor do the FE1 allegations explain the basis of FE1's asserted knowledge about the matter described in the FE1 allegations. ¶¶79-81. The FE1 allegations do not say how FE1 knew that sales personnel told anything to executive management.

The FE1 allegations also fail the second *Zucco* test. *Supra* Point I.C. Allegations are not indicative of scienter if they do not state that a particular individual defendant had knowledge. Here, FE1 does not name any Individual

---

[9] *See Zucco*, 552 F.3d at 996 (rejecting allegations of unnamed witnesses who were not employed during class period); *In re Downey Sec. Litig.*, 2009 WL 2767670, at *10 (C.D. Cal. Aug. 21, 2009) (same); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1135 (E.D. Wash. 2013) (same), *aff'd*, 691 F. App'x 393 (9th Cir. 2017); *see also* 963 F. Supp. 2d at 1110-11 & n.8 ("unnecessary to consider" facts alleged by plaintiff to establish falsity, where facts were not clearly alleged to have occurred during class period).

Defendant, let alone allege that FE1 had personal contact with that Individual Defendant.[10] Alleging contact with generic groups – like "executive management" (¶81), "senior management" (¶78), and "senior executives" (¶232c) – is insufficient. *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938, 954 (D. Ariz. 2007). Insofar as FE1 alleged that sales personnel told executive management merely of "concerns" regarding competition from Instagram, an employee's subjective worries do not constitute the specific facts required by the Reform Act. *Karam v. Corinthian Colls., Inc.*, 2012 U.S. Dist. LEXIS 188594, at *18 (C.D. Cal. Aug. 20, 2012). Finally, that Snap faced competition from Instagram was disclosed in the S-1; by definition, it cannot belie any statement made by Defendants and cannot be indicative of scienter.

**FE2.** FE2 alleges that Snap held a company-wide meeting in January 2017 in which employees told Spiegel and other "senior executives" of "concerns" regarding competition from Instagram. ¶38. Those allegations fail the first *Zucco* test: FE2 is never alleged to have actually attended the meeting or to have had a reliable basis for knowing what happened there. Furthermore, the allegations concerned an event pre-dating the Class Period and thus should be rejected for that reason as well.

The FE2 allegations also fail the second *Zucco* test for the same reasons that the FE1 allegations fail that test. An employee's "concerns" – *i.e.*, subjective worries – do not satisfy the specificity requirement. *Supra* at 20. And again, the S-1 disclosed that Snap faced competition from Instagram. *Supra* at 2-3, 6-7.

### 2. Pompliano Claim

Plaintiffs' claim that the Pompliano lawsuit should have been disclosed under ASC 450 fails to raise a strong inference of scienter because "a failure to follow GAAP, without more, does not establish scienter." *Align*, 856 F.3d at 621 (citations

---

[10] *In re Cisco Sys., Inc. Sec. Litig.*, 2013 U.S. Dist. LEXIS 53137, at *33-34 (N.D. Cal. Mar. 29, 2013) (rejecting allegations of unnamed witnesses for failure to allege direct contact between witnesses and any specific individual defendant); *Avila v. LifeLock Inc.*, 2016 U.S. Dist. LEXIS 104717, at *13-17 (D. Ariz. Aug. 3, 2016) (rejecting allegations of unnamed witnesses that failed to particularize facts establishing personal knowledge of defendants' alleged state of mind).

1  omitted). Where, as here, "the plaintiffs have failed to plead scienter, . . . the

2  plaintiffs' ASC 450 violation claim also fails[.]" *In re Lions Gate Entm't Corp. Sec.*

3  *Litig.*, 165 F. Supp. 3d 1, 22 n.6 (S.D.N.Y. 2016).

4          Moreover, even assuming *arguendo* that Pompliano told Spiegel and Vollero

5  of the allegedly false metrics at issue in the Pompliano complaint, Plaintiffs'

6  Pompliano-related allegations fail to raise a strong inference of scienter. Scienter

7  refers to a defendant's mental state when the defendant made a *class-period*

8  *statement*. But none of the metrics Pompliano calls false was included in the S-1 or

9  any other Class-Period statement. *Supra* at 14-16. Thus, Plaintiffs' Pompliano-

10  related allegations do not support scienter.

11          Relatedly, Pompliano could not possibly have information concerning the

12  mental states of the Individual Defendants as of March 2, 2017. Pompliano left Snap

13  on September 18, 2015 (¶156) – 17 months *before* the IPO. The information he

14  purportedly acquired during his three-week stint at Snap was long stale by the IPO.

15  *In re ICG Commc'ns, Inc. Sec. Litig.*, 2006 WL 416622, at *12 (D. Colo. Feb. 7,

16  2006) (rejecting allegations about defendant's mental state four months prior to start

17  of class period on December 9, 1999: "[P]laintiffs do not allege that Bryan was

18  aware that the kind of problems described in the July, 1999, meeting continued

19  through the fourth quarter of 1999, and the first and second quarters of 2000.").

20                      **3.  Growth Hacking Claim**

21          Plaintiffs' growth hacking allegations also fail to raise a strong inference of

22  scienter. An inference of scienter can be established by alleging a contradiction

23  between what an individual defendant stated and what that defendant knew at the

24  time of the statement. Plaintiffs allege that Spiegel's and Khan's denials of growth

25  hacking as of May 2017 were belied by Spiegel's supposed admission of growth

26  hacking in August 2017. ¶¶253, 259. But that allegation fails to establish any

27  contradiction at all. Even assuming that Spiegel's knowledge as of August 2017

28  may be imputed *back* to Spiegel *and Khan* as of May 2017 – a double assumption

that is dubious and unsupported – Spiegel's statement in August 2017 was *not* an admission of growth hacking. *Supra* at 17-18. Thus, no inference of scienter arose.

### 4. The Complaint Otherwise Fails to Plead Scienter

***Negative Disclosures Negate Inference of Scienter.*** Defendants forthrightly made negative disclosures during the Class Period. *Supra* at 2-3. Those disclosures negate an inference of scienter. *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1211 (11th Cir. 2001) (disclosures "significantly undermine any hint of fraud"). Given that each negative disclosure risked depressing Snap's stock price, the disclosures undermine Plaintiffs' claim that Defendants were intending to artificially inflate Snap's stock price. *Id.*; *see also IBEW Local 97 Pen. Fund v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 630-31 (S.D. Ohio 2011) (questioning why defendants who were supposedly intending to artificially inflate stock price would make repeated negative disclosures).

***Stock Sales Raise No Inference of Scienter.*** The mere allegation of stock sales by Spiegel and Murphy (¶225) is insufficient to allege scienter. As the Ninth Circuit put it: "not every sale of stock by a corporate insider shows that the share price is about to decline." *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). Plaintiff must allege that the amount and timing of the sale were suspicious; to be suspicious, stock sales must have been made "'at times calculated to maximize the personal benefit from undisclosed inside information.'" *Zucco*, 552 F.3d at 1005.

Here, Plaintiffs allege nothing suspicious about the amount or timing of the stock sales. Stock sales by insiders in their company's IPO are not suspicious. *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936, 950 (N.D. Cal. 2010). And in the IPO, Spiegel and Murphy each sold 7% of his stock holdings. *See* S1:166. These percentages are not suspicious. *See Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (sale of 37% not suspicious); *Ronconi*, 253 F.3d at 435 (sale of 17% not suspicious).

***"Core Operations Inference" Is Inapplicable.*** The "core operations

1  inference" (¶214) is unavailable here. The inference – a *presumption* of knowledge

2  absent any allegation of scienter – is permitted only in an "exceedingly rare category

3  of cases." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 n.3 (9th Cir. 2008). It is

4  not enough for a plaintiff to make allegations regarding a company's core business;

5  the plaintiff must allege facts showing why "scienter need not be alleged." *In re*

6  *NVIDIA Corp. Sec. Litig.*, 2010 WL 4117561, at *10 (N.D. Cal. Oct. 19, 2010).

7      No such facts are alleged here. Instead, Plaintiffs conjecture that, simply "by

8  virtue of their positions with Snap," Defendants "would have had" the knowledge

9  that Plaintiffs impute to them. ¶¶214, 216. That bare-bones assertion provides no

10  basis for presuming culpable knowledge on the part of Defendants.

11      **No Inference of Scienter as to Snap.** By failing to raise a strong inference of

12  scienter as to any Individual Defendant, *supra* at 19-23, the Complaint fails to raise

13  such an inference as to Snap itself. *Pittleman v. Impac Mortg. Holdings, Inc.*, 2009

14  WL 648983, at *3 (C.D. Cal. Mar. 9, 2009), *aff'd*, 385 F. App'x 714 (9th Cir. 2010).

15      **Complaint As a Whole Raises No Inference of Scienter.** The Court must

16  not only assess the scienter allegations standing alone, but also conduct a "'holistic'

17  review of the same allegations" to determine their effect in combination. *Zucco*, 552

18  F.3d at 992. Here, the non-fraudulent explanation for Defendants' conduct is far

19  more compelling than is Plaintiffs' theory of securities fraud.

20      In short, Snap's S-1 fully disclosed (i) its historical DAU figures, (ii) the

21  competition from Instagram, (iii) Instagram Stories' mimicry of Snap's Stories

22  feature, (iv) the fact that competition from Instagram and others had adversely

23  affected growth, and (v) the risks that Snap's user growth rate will decline and that

24  its DAU may not grow. Snap's S-1 also made no representations whatsoever about

25  its future growth rate. On the contrary, it took pains to underscore all the reasons

26  why Snap's prospects were uncertain in the face of competition and other factors.

27  *Supra* at 2-3. And Spiegel's August 10 comment did not admit growth hacking or

28  otherwise contradict the May 10 statements. Thus, far from being victims of fraud,

1  Plaintiffs disregarded Snap's disclosures, misread Spiegel's comment, and bought
2  Snap stock. That they now have buyer's remorse does not state a claim of securities
3  fraud. *See In re Adolor Corp. Sec. Litig.*, 616 F. Supp. 2d 551, 570 (E.D. Pa. 2009)
4  ("[B]uyer's remorse does not entitle [Plaintiffs] to relief under Rule 10b-5.").

5  **III.  PLAINTIFFS FAIL TO STATE A SECURITIES ACT CLAIM**

6        **A. Plaintiffs Fail to Allege a False or Misleading Statement or Omission**

7        Plaintiffs' Securities Act allegations fail for the same reason their Exchange
8  Act allegations concerning the S-1 fail: the Complaint does not show that the S-1
9  contained an "untrue statement of a material fact" or "omitted to state a material fact
10 . . . necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a) (§
11 11); *supra* at 6-11 (Instagram Claim alleges no untrue statements or omissions), 11-
12 16 (same for Pompliano Claim).

13       **B. Plaintiffs Fail to Allege a Violation of SEC Regulations**

14       Plaintiffs offer one allegation unique to the Securities Act claims: violations
15 of SEC Regulation S-K. But here they add nothing to their prior allegations. They
16 simply quote language from Regulation S-K's Items 503 and 303, and repeat the
17 same alleged omissions. They do not show how Defendants violated the regulations.

18       ***Item 503.*** Plaintiffs state that this provision requires the S-1 to "discuss" "the
19 most significant factors that make the offering speculative or risky" and "[e]xplain
20 how the risk affects the issuer or the securities being offered." ¶366 (citing 17
21 C.F.R. § 229.503(c)). But the S-1 is replete with detailed, specific risk factors.
22 S1:26-58. The risks that Plaintiffs claim were not disclosed – concerning Instagram
23 and the Pompliano lawsuit – were in fact disclosed. *Supra* at 6-16.

24       ***Item 303.*** Plaintiffs fail to state a violation of Item 303. They claim that Snap
25 failed to disclose "the known, adverse trend posed by competition from Instagram's
26 Stories." ¶374. But that *was* disclosed. *Supra* at 6-11. They claim that Snap failed to
27 disclose "the known uncertainty posed by Pompliano's allegations that the
28 Company's user engagement metric were [sic] unreliable." ¶375. But that, too, *was*

1    disclosed. *Supra* at 11-16. Plaintiffs' only other allegation simply repeats the

2    unavailing assertion that Pompliano triggered the correction of DAU figures. ¶375;

3    *supra* at 16.

4       Moreover, to plead an Item 303 violation, "plaintiff must allege facts showing

5    defendants knew of an adverse trend." *Belodoff v. Netlist, Inc.*, 2009 U.S. Dist.

6    LEXIS 39903, at *32-33 (C.D. Cal. Apr. 17, 2009). Thus, the Item 303 claim fails

7    because Plaintiffs fail to plead scienter. *Supra* at 19-24. As in *Netflix*, Snap did not

8    "withh[o]ld information about a known trend or uncertainty," but "repeatedly stated

9    that success in [its] market depended on multiple factors, especially [Snap's] ability

10   to keep its [user] base large and happy." *In re Netflix, Inc. Sec. Litig.*, 923 F. Supp.

11   2d 1214, 1221 (N.D. Cal. 2013); *see* S1:26-27, 74-75.

12      **C. The Securities Act Claim Must Be Dismissed for Lack of Damages**

13       The § 11 claim must also be dismissed for lack of damages. *See Pierce v.*

14   *Morris*, 2006 U.S. Dist. LEXIS 57366, at *17-18 (N.D. Tex. Aug. 16, 2006).

15   Damages for claims under § 11 are determined as the difference between the

16   offering price and the price when suit is brought. 15 U.S.C. § 77k(e). Suit is

17   brought as of the first-filed complaint, not an amended or consolidated complaint.[11]

18   To use the date of a later-filed complaint would permit "damage shopping." *Wash.*

19   *Mut.*, 2010 U.S. Dist. LEXIS 142992, at *53-54.

20       Plaintiffs' § 11 claim must be dismissed because their damages are *zero*.

21   Neither Plaintiff claims that he sold shares of Snap's stock before May 16, 2017, the

22   day the first-filed complaint in this consolidated action was filed. Dkts. 1-1, 72. And

23   on May 16, 2017, Snap shares were trading at $20.78 – *above* the offering price of

24   $17. Ex. 4. Because the first-filed complaint was filed before the stock price had

25   ever dropped below the offering price, Plaintiffs could not possibly have damages.

26       For the foregoing reasons, the Complaint should be dismissed.

27

28

[11] *In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2010 U.S. Dist. LEXIS 142992, at *52-53 (W.D. Wash. Oct. 12, 2010); *Pierce*, 2006 U.S. Dist. LEXIS 57366, at *5, *17-18.

Dated:  December 1, 2017

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:   /s/  Boris Feldman
Boris Feldman

*Attorneys for Defendants Snap Inc., Evan Spiegel, Robert Murphy, Andrew Vollero, Imran Khan, Joanna Coles, A.G. Lafley, Mitchell Lasky, Michael Lynton, Stanley Meresman, Scott D. Miller, and Christopher Young*