MATTHEW W. CLOSE (S.B. #188570)
O'MELVENY & MYERS LLP
400 South Hope Street, 18th Floor
Los Angeles, CA 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

JONATHAN ROSENBERG (*admitted pro hac vice*)
O'MELVENY & MYERS LLP
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Defendants Morgan Stanley & Co. LLC; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Deutsche Bank Securities Inc.; Barclays Capital Inc.; Credit Suisse Securities (USA) LLC; Allen & Company LLC*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE SNAP INC. SECURITIES LITIGATION | Case No. 17-CV-03679-SVW-AGR<br><br>**CLASS ACTION**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF UNDERWRITERS' MOTION TO DISMISS AND JOINDER IN SNAP DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>Hearing Date: February 26, 2018<br>Time: 1:30 p.m.<br>Courtroom: 10A<br>Judge: Stephen V. Wilson |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................... 1

ARGUMENT ........................................................................................................... 3

    I.    The Instagram Claim Allegations Do Not State a Securities Act Claim .................................................................................................... 3

    II.   The Pompliano Claim Allegations Do Not State a Securities Act Claim .................................................................................................... 7

CONCLUSION ........................................................................................................ 9

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ................................................................................................ 3

*In re Connetics Corp. Sec. Litig.*,
　542 F. Supp. 2d 996 (N.D. Cal. 2008) .................................................................... 8

*In re Convergent Techs. Sec. Litig.*,
　948 F.2d 507 (9th Cir. 1991) .................................................................................. 7

*In re Coty Inc. Sec. Litig.*,
　2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ........................................................ 6

*Del Giudice v. S.A.C. Cap. Mgmt., LLC*,
　2009 WL 424368 (D.N.J. Feb. 19, 2009) ............................................................... 8

*DeMaria v. Andersen*,
　318 F.3d 170 (2d Cir. 2003) ........................................................................... 1, 4, 9

*Garber v. Legg Mason, Inc.*,
　347 F. App'x 665 (2d Cir. 2009) ......................................................................... 2, 8

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
　2017 WL 1536223 (D.N.J. Apr. 27, 2017) ............................................................. 9

*Howard Gunty Profit Sharing v. Quantum Corp.*,
　1997 WL 514993 (N.D. Cal. Aug. 14, 1997) ......................................................... 7

*Hudson v. Sherwood Sec. Corp.*,
　1989 WL 534960 (N.D. Cal. May 9, 1989) ........................................................... 3

*Impac Warehouse Lending Grp. v. Credit Suisse First Boston LLC*,
　270 F. App'x 570 (9th Cir. 2008) ........................................................................... 3

*Jaroslawicz v. M&T Bank Corp.*,
　2017 WL 4856864 (D. Del. Oct. 27, 2017) ............................................................ 6

*Kowal v. MCI Comm's Corp.*,
　16 F.3d 1271 (D.C. Cir. 1994) ............................................................................ 2, 5

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lefter v. Yirendai Ltd.*,
    2017 WL 2857535 (C.D. Cal. June 20, 2017) ........................................................ 7

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) .......................................................... 8

*Ott v. Home Sav. & Loan Assoc.*,
    265 F.2d 643 (9th Cir. 1958) ................................................................................. 3

*In re Quarterdeck Office Sys., Inc., Sec. Litig.*,
    854 F. Supp. 1466 (C.D. Cal. 1994) ...................................................................... 5

*Quinones v. MetLife Home Loans, N.A.*,
    2012 WL 12896373 (C.D. Cal. Dec. 13, 2012) ..................................................... 3

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ............................................................................... 2

*In re Stac Elecs. Sec. Litig.*
    89 F.3d 1399 (9th Cir. 1996) ................................................................................. 7

*In re XM Satellite Radio Holdings Sec. Litig.*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ................................................................... 2, 5

**RULES**

Fed. R. Civ. P. 8 ............................................................................................................ 3

iii

MP&A IN SUPP. OF UNDERWRITERS'
MTD & JOINDER IN SNAP DEFS.' MTD
NO. 17-CV-03679

# INTRODUCTION[1]

The Underwriters join in the Snap Defendants' Motion to Dismiss the Consolidated Complaint and in their Request for Judicial Notice, and incorporate by reference the arguments in those filings. The Underwriters respectfully submit this brief to emphasize why the Securities Act claims, the only claims asserted against the Underwriters (Counts III and IV), must be dismissed.

The Securities Act claims are limited to what the Snap Brief describes as (i) the Instagram Claim, i.e., that Snap "minimiz[ed] the known adverse impact that Instagram's clone Stories function was having on Snap's user growth and engagement"; and (ii) the Pompliano Claim, i.e., that Snap did not disclose the "existence and substance" of a January 2017 lawsuit filed by former Snap employee Anthony Pompliano. (¶¶ 301–304, 361–65; Br. 1.) Only approximately 30 of the Complaint's 117 pages are part of the Securities Act claims (¶¶ 380, 394), which exclude allegations that are potentially relevant only to the Exchange Act claims (*id.*), such as those described in the Snap Brief as part of the "Growth Hacking Claim" (Br. 1, 17–18; ¶¶ 249–60).

The Securities Act claims fail in the face of three important governing legal rules:

- The Court must consider the S-1 as a whole, not out-of-context snippets. *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (affirming

---

[1] The "Underwriters" submitting this Memorandum are Defendants Morgan Stanley & Co. LLC, Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, Deutsche Bank Securities Inc., Barclays Capital Inc., Credit Suisse Securities (USA) LLC, and Allen & Company LLC. References in this Memorandum to the "Snap Brief" or "Br." are to the Memorandum of Points and Authorities in Support of Snap Defendants' Motion to Dismiss the Consolidated Complaint. For the Court's convenience, we otherwise use in this Memorandum the terms defined in the Snap Brief's Table of Abbreviations, except we refer to the exhibits attached to the Declaration of Boris Feldman in Support of Snap Defendants' Motion to Dismiss as "Snap Ex. ___," and to the exhibits attached to the Declaration of Jonathan Rosenberg, Esq., in Support of Underwriters' Motion to Dismiss and Joinder in Snap Defendants' Motion to Dismiss the Consolidated Amended Complaint as "UW Ex. ___." Citations to the S-1 use the numbering of Snap Ex. 1.

dismissal of Securities Act claims and noting that prospectus must be read "as a whole" without "focus on whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together in context, would have misl[ed] a reasonable investor") (internal quotation omitted).

- The issuer has no obligation in a registration statement to denigrate its products or to speak in pejorative terms about its prospects for competing successfully. *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 181 (D.D.C. 2007) (noting that company has "no duty to disparage its own competitive position in the market" if it makes accurate disclosures allowing "analysts and investors" to "draw their own conclusions"); *see also Kowal v. MCI Comm's Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (affirming dismissal of allegations calling for "pejorative characterizations of disclosed factual matters").

- A fact not included in the S-1 cannot be an actionable material omission when it is publicly known. *See Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1162–63 (9th Cir. 2009) (holding that "Section 11 does not require" disclosure of "publicly available" information); *Garber v. Legg Mason, Inc.*, 347 F. App'x 665, 668 (2d Cir. 2009) (affirming dismissal of Securities Act claims because facts allegedly omitted from registration statement were "already in the public domain" and "reasonably available to [defendant's] shareholders" and therefore not material); *see also* Br. 9–12.

Applying those legal principles here requires that the Securities Act claims be dismissed. As explained in the Snap Brief and below, the S-1 adequately disclosed the competition Snap was facing from Instagram and its "Stories" feature (Br. 6–9), and Snap's restatement of user metrics during 2015, the subject of the Pompliano lawsuit (*id*. 15). The competition from Instagram and its "Stories"

feature, and the existence and substance of the Pompliano lawsuit, were also public knowledge before publication of the S-1. They, therefore, cannot form the basis of a Securities Act claim.

## ARGUMENT

As the Snap Brief shows, Plaintiffs' Securities Act claims are subject to Rule 9(b)'s heightened pleading requirements because the claims sound in fraud. (Br. 5.) The claims fail to meet these heightened pleading requirements. But what is equally clear from the Snap Brief is that the Securities Act claims are also inadequate under Rule 8's pleading standards. Rule 8 requires "factual content that allows the court to draw the reasonable inference that the defendant is liable," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), not just "a sheer possibility that [Defendants have] acted unlawfully," *Quinones v. MetLife Home Loans, N.A.*, 2012 WL 12896373, at *1 (C.D. Cal. Dec. 13, 2012) (quoting *Iqbal*, 556 U.S. at 678). Conclusory allegations that rely on labels are insufficient, *see Impac Warehouse Lending Grp. v. Credit Suisse First Boston LLC*, 270 F. App'x 570, 572 (9th Cir. 2008), as are allegations that are refuted by documents the Court can consider on a motion to dismiss, *see Hudson v. Sherwood Sec. Corp.*, 1989 WL 534960, at *1 (N.D. Cal. May 9, 1989) (citing *Ott v. Home Sav. & Loan Assoc.*, 265 F.2d 643, 646 n.1 (9th Cir. 1958)). By failing to plead facts showing an actionable misstatement or material omission in the S-1, the Complaint fails to "show[] that the pleader is entitled to relief." Fed. R. Civ. P. 8.

### I. The Instagram Claim Allegations Do Not State a Securities Act Claim.

The S-1 disclosed the "actual, already existing" harm to Snap caused by competition from Instagram and its "Stories" feature. (Br. 1, 6–9.) That is reflected in the S-1's trio of disclosures regarding the effect of competition on Snap's user-engagement: (i) it identified Facebook as a better-capitalized and more established global competitor that had acquired Instagram, which had

developed a Stories feature that "mimicked" Snap's Stories feature (S1:32); (ii) it disclosed that Snap's daily average user rates had recently experienced periods of "flat" growth (*id.* 26, 36, 75); and (iii) it attributed that "flat" growth to competition (*id.* 75). Thus, the S-1, viewed in its entirety as required, *DeMaria*, 318 F.3d at 180, gave investors all the information they needed in considering Snap's competitive position.

*First*, the S-1 cautioned that Snap's "business is highly competitive," and that Snap "face[s] significant competition that we anticipate will continue to intensify." (S1:32.) Prominent among the competitors discussed is "Facebook (including Instagram and WhatsApp)," which the S-1 describes as a "larger, more established" competitor, with "significantly greater resources and broader global recognition and occupy[ing] better competitive positions in certain markets than we do." (*Id.*) And the S-1 specifically noted Instagram's key competitive threat, its "'stories' feature that largely mimics our Stories feature." (*Id.*)

*Second*, the S-1 described recent periods of "flat" user growth (*id.* 26, 36, 75), a far cry from the Complaint's allegation that the S-1 characterized Snap's growth rate as "accelerating" (¶ 349). The S-1 disclosed, for example, that Snap's user growth was "relatively flat in the latter part of the quarter ended September 30, 2016" (S1:26), and into "the early part of the quarter ended December 31, 2016" (*id.* 75), the last quarter on which Snap reported before the IPO. While the S-1 reported increased user growth in December 2016, it cautioned that (i) this growth "was driven in part by seasonal trends" (*id.*), and (ii) investors should generally not infer trends based on user-engagement statistics for the last month of a quarter (*id.* 77).

*Third*, the S-1 tied Snap's "relatively flat" user growth to increased competition, specifically identifying Facebook/Instagram. (*See* Br. 6–9; S1:32, 75.) In addition to the statements cited in the Snap Brief, the S-1 noted that Snap was particularly vulnerable to losing users to competitors because its core user

base, 18-to-34-year-olds, "may be less brand loyal and more likely to follow trends," which could lead them "to switch to another product." (S1:26.)

Thus, any reasonable investor would have shared the "anxiety" and "concerns" about Instagram's "mimicked" Stories that Plaintiffs allege Snap employees and advertisers were expressing. (¶¶ 350–54). Plaintiffs' allegation that the S-1 portrays Instagram as posing only a "hypothetical possibility of competition" (¶ 358) simply cannot be squared with the S-1's copious descriptions of actual "increased competition" in 2016, including from companies like Instagram that "launched products with similar functionality to ours," contributing to "flat growth" in the last reported quarter before the IPO. (Br. 6–9.) And as the Snap Brief explains (Br. 7–8), the S-1's additional forward-looking caution regarding the risk of future Instagram competition ("may be directly competitive") did not undermine the S-1's clear and robust disclosures about existing, ongoing Instagram competition. *See also In re Quarterdeck Office Sys., Inc., Sec. Litig.*, 854 F. Supp. 1466, 1471 (C.D. Cal. 1994) (dismissing challenge to disclosure of competition that "warned investors that competitive pressure could result in price reductions and a decline in sales volume").

No further discussion of Instagram's Stories was necessary, including the self-flagellating "existential threat" label Plaintiffs demand. Any such statement would not only have been itself false (*see* Br. 10–11), it would also have been tantamount to the S-1 disparaging the competitive position of Snap's Stories feature to that of Instagram's, which the Securities Act does not require. *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d at 181; *Kowal*, 16 F.3d at 1276. And since the alleged omissions were actually disclosed, Plaintiffs' Item 303 and 503 allegations likewise fail to state a Securities Act claim. (*See* Br. 24–25); *see also Jaroslawicz v. M&T Bank Corp.*, 2017 WL 4856864, at *4 (D. Del. Oct. 27, 2017) (dismissing claim based on Item 503 because "allegedly omitted facts" were "disclosed"); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6–8, 10, 12

(S.D.N.Y. Mar. 29, 2016) (dismissing Securities Act claims based on alleged Item 303 required disclosures).

Even without the roadmap provided in the S-1, the open competition between Snap and Instagram was a matter of public record. A November 2016 article cited in the Complaint (albeit, not in the paragraphs incorporated in the Securities Act claims) describes how Instagram had copied Stories, leading commenters to conclude that Instagram was trying to "takeover" Snap. (Br. 9–10.) And that article was followed by many others with more information and color. By January 2017, newspapers from coast to coast were reporting that Instagram's cloned "stories" feature had *150 million users*, drawing the obvious inference that Instagram's growth came at Snap's expense. (*See* Request for Judicial Notice in Support of Underwriters' Motion to Dismiss and Joinder in Snap Defendants' Motion to Dismiss the Consolidated Amended Complaint at 1–2.[2]) This was a very public and intense competition between products touting similar features. It was as much a secret to the investor community as Diet Coke's competition with Diet Pepsi, or Mustang's with Camaro.

Not surprisingly, courts have repeatedly rejected investor nondisclosure claims based on competition known to consumers. For example, in *In re Stac Electronics Securities Litigation*, the court stated that "customer resistance to purchasing a product in anticipation of newer products is precisely the sort of

---

[2] *E.g.*, Sapna Maheshwari, *More Ads to Appear on Instagram, Now on 'Stories' Feature*, N.Y. Times, Jan. 11, 2017 at B5, UW Ex. A (noting that Instagram "said 150 million accounts a day were now using Instagram Stories, which made waves for its mimicry of Snapchat Stories"); Josh Constine, *Instagram Stories is stealing Snapchat's users*, TechCrunch, Jan. 30, 2017 (describing Instagram as "stealing Snapchat users" and "eating up Snapchat usage, reducing the Stories views it depends on to drive ad revenue") Snap Ex. 6; Olivia Solon, *Snapchat rising: is Facebook-sized success the future for this youthful app?*, The Guardian, Feb. 3, 2017, UW Ex. B ("Instagram Stories has been massively successful . . . [i]t's sucked some of the air out of Snapchat's sales over the last few months."); Michael Hiltzik, *Ignore the hype. Snap IPO is a sucker's bet*, Los Angeles Times, Feb. 4, 2017 at C3, UW Ex. C ("Snap's terrific rate of customer growth has slowed sharply," in part because "something . . . happened that should raise an alarm: On Aug. 2, Instagram . . . introduced a clone of Snapchat's 'stories' function.").

market awareness that we have held to defeat claims of fraud on the market." 89 F.3d 1399, 1410 (9th Cir. 1996) (*citing In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 513 (9th Cir. 1991)); *see also Howard Gunty Profit Sharing v. Quantum Corp.*, 1997 WL 514993, at *4 (N.D. Cal. Aug. 14, 1997) (finding no duty to disclose in Exchange Act case because "information about consumer preferences is indeed available to the investing public" and companies owe no obligation to "educate the public about [the] potential impact . . . of publicly known facts") (internal quotation omitted); *Lefter v. Yirendai Ltd.*, 2017 WL 2857535, at *7 (C.D. Cal. June 20, 2017) (same). Likewise here, the investing public didn't need to be educated about customers potentially preferring Instagram's to Snap's Stories feature.

## II. The Pompliano Claim Allegations Do Not State a Securities Act Claim.

Plaintiffs also cannot state a claim based on the alleged omission from the S-1 of the "core allegations" in the Pompliano lawsuit (¶ 333), because (i) the events described in the Pompliano complaint were too remote in time (*see* Br. 14–16); (ii) Pompliano's "core allegations" about Snap's "historically misstated" user metrics were publicly reported before the IPO (*see id.* 13–14), and (iii) the S-1 adequately addresses that topic in any event (*see id.* 15).

*First*, Plaintiffs cannot tie the events of September 2015 to Snap's processes and practices as of the March 2017 IPO. Pompliano left the company in September 2015 (after only a three-week tenure), and thus is in no position to report about Snap's internal processes 18 months later. None of the former employees referenced in the Complaint describes any issues with Snap's calculation of user engagement. (¶¶ 350–54.) Nor does the S-1 include any of the user-metric data that Pompliano allegedly believed 18 months earlier were inaccurate. (*See* Br. 14–16.) Without any tie between the IPO and old allegations in another pleading, there is no basis for a Securities Act claim. *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (finding

1  no authority for proposition that allegations could rest on another complaint); *see*
2  *also Maine State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 WL 4389689, at *20
3  (C.D. Cal. May 5, 2011) (granting motion to strike because "[t]he Court agrees . . .
4  that Plaintiffs cannot rely on allegations from other complaints that the Plaintiffs
5  themselves have not investigated"); *Del Giudice v. S.A.C. Cap. Mgmt., LLC*, 2009
6  WL 424368, at *6 (D.N.J. Feb. 19, 2009) (explaining that filing attorney may not
7  rely "solely upon the inquiry conducted by another attorney").

8      *Second*, Pompliano's allegations were not material to the S-1 because both
9  the complaint and its substance were widely publicized before the IPO.  (*See* Br.
10 12–14.)  For example, the day after Pompliano filed his complaint, *Forbes*
11 published an article titled, "Former Snapchat Employee Alleges Company Inflated
12 Growth Metrics" (Snap Ex. 11), and *Bloomberg* published a similar report (Snap
13 Ex. 10).  Thus, Plaintiffs' contention that the core allegations were unknown
14 (¶ 333) is simply untrue, warranting dismissal.  *See Garber*, 347 F. App'x at 668
15 (affirming dismissal of claim based in part on alleged omission of publicly
16 available information).

17     *Third*, the S-1 disclosed Snap's issues with user-metric calculations and the
18 inherent imprecision of those figures.  Snap stated that it had before June 2015
19 relied on a third party that calculated daily users in a different way than Snap's
20 current method, and that Snap had since restated and reduced its user estimates
21 from that period to be more consistent with Snap's current method.  (S1:35; *see*
22 *also* Br. 15.)  Plaintiffs, in fact, concede that the S-1 "confirmed" that Snap had
23 previously stated higher user numbers due to reliance on a third party.  (¶ 333.)
24 More broadly, the S-1 cautioned that Snap's user metrics "are subject to inherent
25 challenges in measurement."  (S1:35.)  Viewed in its entirety, *DeMaria*, 318 F.3d
26 at 180, the S-1 disclosed Snap's historical inaccuracies with and difficulties in
27 calculating user metrics—i.e., the Pompliano complaint's "core allegations."
28

Nor can Plaintiffs state a Securities Act claim based on Snap's subjective determination under GAAP ASC 450 that the Pompliano lawsuit did not qualify as a loss contingency that needed to be disclosed. As shown in the Snap Brief, Plaintiffs fail to allege facts, as opposed to conclusions, showing that Snap's accounting opinion was outside the range of reasonableness that GAAP tolerates. (Br. 12–14); *see also In re Hertz Global Holdings, Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017) (dismissing complaint based in part on holding that *Omnicare* opinion-pleading standard applies to allegations attacking ASC 450 and other GAAP judgments).

## CONCLUSION

For the foregoing reasons and those set out in the Snap Defendants' brief, the Court should dismiss Counts III and IV, the only counts in which the Underwriters are named as defendants.

Dated:  December 1, 2017                    O'MELVENY & MYERS LLP

                                            By:  */s/ Jonathan Rosenberg*
                                                    Jonathan Rosenberg

                                            *Attorneys for Defendants Morgan Stanley & Co. LLC; Goldman Sachs & Co. LLC; J.P. Morgan Securities LLC; Deutsche Bank Securities Inc.; Barclays Capital Inc.; Credit Suisse Securities (USA) LLC; and Allen & Company LLC*