BORIS FELDMAN, State Bar No. 128838
Email: boris.feldman@wsgr.com
IGNACIO E. SALCEDA, State Bar No. 164017
Email: isalceda@wsgr.com
DORU GAVRIL, State Bar No. 282309
Email: dgavril@wsgr.com
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 565-5100

*Attorneys for Defendants Snap Inc.,*
*Evan Spiegel, Robert Murphy,*
*Andrew Vollero, and Imran Khan*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| IN RE SNAP INC. SECURITIES LITIGATION | Case No. 2:17-cv-03679-SVW-AGR |
|---|---|
| | **CLASS ACTION** |
| | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO LEAD PLAINTIFF SNAP SHAREHOLDER GROUP'S MOTION FOR CLASS CERTIFICATION** |
| | Date: August 5, 2019 Time: 1:30 p.m. Courtroom: 10A Honorable Stephen V. Wilson |
| This Document Relates To: All Actions | |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1

## TABLE OF CONTENTS

2

TABLE OF ABBREVIATIONS ..................................................................... V

3

INTRODUCTION ............................................................................................ 1

4

FACTUAL AND PROCEDURAL BACKGROUND ...................................... 2

5

     A.   Snap's IPO Shares Commingled with Non-IPO Shares ..................... 2

6

     B.   First Lawsuit Filed While Stock Price Was Above IPO Price ............. 3

7

     C.   Lead Counsel's Failed Attempt to Substitute the Lead Plaintiff .......... 4

     D.   New Lead Plaintiffs, With the Same Lead Counsel ........................... 4

8

ARGUMENT ................................................................................................... 5

9

I.     PLAINTIFFS MAY NOT MAINTAIN A SECURITIES ACT CLASS ........ 5

10

     A.   Plaintiffs' Securities Act Class Claims Are Time-Barred ................... 5

11

     B.   Any Securities Act Class Must Be Limited to Purchasers Who
          Can Trace Their Stock to the IPO ....................................................... 12

12

     C.   The Proposed Class Fails Predominance because Statutory

13

          Damages under the Securities Act Cannot Be Calculated ................ 14

14

          1.   Applicable Law ........................................................................ 14

15

          2.   Plaintiffs' Expert Fails to Identify an Actual Model ............... 15

16

          3.   Predominance Cannot Be Established Until the Court
               Determines "The Time [the] Suit Was Brought" ................... 17

17

II.    ANY EXCHANGE ACT CLAIMS MUST BE NARROWED .................... 18

18

     A.   Class Periods in Securities Actions Are Limited by the Alleged

19

          Corrective Disclosures ....................................................................... 18

20

     B.   Plaintiffs Admit that Corrective Disclosures Were Made before
          the End of the Proposed Class Period ................................................. 19

21

     C.   Subsequent Alleged Disclosures Do Not Alter the

22

          Unreasonableness of Class Members' Reliance after May 10,
          2017 ................................................................................................... 21

23

III.   PLAINTIFFS ARE ATYPICAL AND INADEQUATE ............................. 22

24

     A.   The Proposed Class Representatives Are Subject to Unique

25

          Defenses Regarding Their Reliance ................................................... 22

26

     B.   The Proposed Class Representatives Have Abdicated Leadership
          of the Class to Lead Counsel ............................................................. 24

27

CONCLUSION ............................................................................................. 25

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*American Pipe & Construction Co. v. Utah,*
  414 U.S. 538 (1974) ........................................................................ 6, 8

*Applestein v. Medivation, Inc.,*
  2010 U.S. Dist. LEXIS 98255 (N.D. Cal. Sept. 17, 2010) ........................... 22

*Armendariz v. Santa Fe Cty. Bd. of Comm'rs,*
  331 F. Supp. 3d 1245 (D.N.M. 2018) ........................................................ 11

*Armstrong v. Martin Marietta Corp.,*
  138 F.3d 1374 (11th Cir. 1998) ................................................................. 9

*Blake v. JP Morgan Chase Bank N.A.,*
  2019 U.S. App. LEXIS 18370 (3d Cir. June 19, 2019) ........................... 10, 11

*China Agritech, Inc. v. Resh,*
  138 S. Ct. 1800 (2018) ................................................................... *passim*

*Comcast Corp. v. Behrend,*
  569 U.S. 27 (2013) ................................................................................. 14

*Crown, Cork & Seal Co. v. Parker,*
  462 U.S. 345 (1983) ................................................................................. 9

*Eichenholtz v. Verifone Holdings, Inc.,*
  2008 U.S. Dist. LEXIS 64633 (N.D. Cal. Aug. 22, 2008) ........................... 22

*Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.,*
  301 F.R.D. 116 (S.D.N.Y. 2014) .............................................................. 15

*Griffin v. Singletary,*
  17 F.3d 356 (11th Cir. 1994) ..................................................................... 9

*Hanon v. Dataproducts Corp.,*
  976 F.2d 497 (9th Cir. 1992) ................................................................... 22

*Hayes v. MagnaChip Semiconductor Corp.,*
  2016 U.S. Dist. LEXIS 177787 (N.D. Cal. Dec. 22, 2016) ..................... 2, 18

*In re Broderbund/Learning Co. Sec. Litig.,*
  294 F.3d 1201 (9th Cir. 2002) ................................................................. 17

*In re Century Alum. Co. Sec. Litig.,*
  729 F.3d 1104 (9th Cir. 2013) ........................................................ 1, 12, 13

*In re Fannie Mae Sec. Litig.,*
  247 F.R.D. 32 (D.D.C. 2008) ................................................................... 21

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
  574 F.3d 29 (2d Cir. 2009) ..................................................................... 23

*In re IMAX Sec. Litig.*,
  272 F.R.D. 138 (S.D.N.Y. 2010).................................................................23

*In re LendingClub Sec. Litig.*,
  282 F. Supp. 3d 1171 (N.D. Cal. 2017) .......................................................13

*In re Nature's Sunshine Product's Inc.*,
  251 F.R.D. 656 (D. Utah 2008).................................................................21

*In re Petrobras Sec. Litig.*,
  862 F.3d 250 (2d Cir. 2017).......................................................................13

*In re POM Wonderful LLC Mktg. & Sales Practice Litig.*,
  2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) ........................................15, 16

*In re Quarterdeck Office Sys., Inc. Sec. Litig.*,
  1993 U.S. Dist. LEXIS 19806 (C.D. Cal. Sept. 30, 1993)......................13, 25

*In re SunEdison, Inc. Sec. Litig.*,
  329 F.R.D. 124 (S.D.N.Y. 2019)........................................................2, 18, 19

*In re Terayon Commc'ns Sys., Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 3131 (N.D. Cal. Feb. 23, 2004)..............................23

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
  2010 U.S. Dist. LEXIS 142992
  (W.D. Wash. Oct. 12, 2010)........................................................................17

*In re Wells Fargo Mortg.-Backed Certificates Litig.*,
  2010 U.S. Dist. LEXIS 124498 (N.D. Cal. Oct. 19, 2010)............................9

*Junod v. NWP Servs. Co.*,
  2016 U.S. Dist. LEXIS 195195 (C.D. Cal. July 18, 2016) .....................13, 14

*Krim v. PCOrder.com*,
  402 F.3d 489 (5th Cir. 2005)......................................................................12

*Loritz v. Exide Techs.*,
  2015 WL 6790247 (C.D. Cal. July 21, 2015) ...............................1, 14, 15, 16

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012)........................................................................1

*Painters & Allied Trades Dist. Council 82 Health Care Fund v.
  Forest Pharm., Inc.*,
  915 F.3d 1 (1st Cir. 2019) ..........................................................................10

*Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec.
  Trans., Inc.*,
  730 F.3d 263 (3d Cir. 2013).........................................................................8

*Perrin v. Southwest Water Co.*,
  2014 U.S. Dist. LEXIS 185165 (C.D. Cal. July 2, 2014).
  *aff'd sub nom. Hemmer Group v. Southwest Water Co.*,
  663 F. App'x (9th Cir. 2016)......................................................................12

*Practice Mgmt. Support Servs. v. Cirque du Soleil Inc.*,
    2018 U.S. Dist. LEXIS 129633 (N.D. Ill. Aug. 2, 2018)................................11

*Salazar-Calderon v. Presidio Valley Farmers Ass'n*,
    765 F.2d 1334 (5th Cir. 1985)......................................................................9

*Salsitz v. Peltz*,
    210 F.R.D. 95 (S.D.N.Y. 2002)..................................................................24

*Tsirekidze v. Syntax-Brillian Corp.*,
    2009 U.S. Dist. LEXIS 61145 (D. Ariz. July 17, 2009) ................................13

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    325 F.R.D. 280 (D. Minn. 2018)..................................................................21

*Werdebaugh v. Blue Diamond Growers*,
    2014 WL 7148923 (N.D. Cal. Dec. 15, 2014) .........................................15, 16

*Woodall v. Cty. of Wayne*,
    2019 U.S. Dist. LEXIS 50186 (E.D. Mich. Mar. 26, 2019) ..........................11

*Xiang v. Inovalon Holdings, Inc.*,
    327 F.R.D. 510 (S.D.N.Y. 2018)............................................................18, 19

**STATUTES**

15 U.S.C. § 77k...............................................................................................12

15 U.S.C. § 77k(e)...........................................................................................17

15 U.S.C. § 77m...............................................................................................8

15 U.S.C. § 78u-4(a)(3)....................................................................................11

**RULES**

Fed. R. Civ. P. 23(a)(3)....................................................................................22

Fed. R. Civ. P. 23(a)(4)....................................................................................22

Fed. R. Civ. P. 23(c)(1).....................................................................................9

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| Compl. or ¶ | Plaintiffs' Consolidated Second Amended Class Action Complaint for Violation of the Federal Securities Laws, ECF No. 272 |
| Snap or Company | Snap Inc. |
| Snap Defendants | Snap, Evan Spiegel, Robert Murphy, Andrew Vollero, and Imran Khan |
| Ex. _ | Exhibits to Declaration of Doru Gavril in Support of Defendants' Opposition to Lead Plaintiff Snap Shareholder Group's Motion For Class Certification ("Gavril Decl."), filed herewith |
| RS | Excerpts from Snap's Registration Statement on Form S-1, declared effective on March 1, 2017, including Form 424B4 Prospectus filed on March 3, 2017, attached as Ex. 1 to Gavril Decl. |
| IPO | Initial public offering |
| PSLRA | Private Securities Litigation Reform Act of 1995 |
| KTMC | Kessler Topaz Meltzer & Check, LLP |
| Porwal Decl. | Redacted Declaration of Atul Porwal, attached as Ex. 4 to Gavril Decl. |
| Thomas Decl. | Redacted Declaration of Winston O. Thomas, attached as Ex. 5 to Gavril Decl. |
| Allen Tr. | Excerpts from the transcript of Donald R. Allen, attached as Ex. 6 to Gavril Decl. |
| Butler Tr. | Excerpts from the transcript of Rickey E. Butler, attached as Ex. 7 to Gavril Decl. |
| Dandridge Tr. | Excerpts from the transcript of Shawn B. Dandridge, attached as Ex. 8 to Gavril Decl. |
| Dukes Tr. | Excerpts from the transcript of Alan L. Dukes, attached as Ex. 9 to Gavril Decl. |
| Melgoza Tr. | Excerpts from the transcript of Smilka Melgoza, attached as Ex. 10 to Gavril Decl. |
| Nelson Tr. | Excerpts from the transcript of Tony Ray Nelson, attached as Ex. 11 to Gavril Decl. |

| Tilahun Tr. | Excerpts from the transcript of Rediet Tilahun, attached as Ex. 12 to Gavril Decl. |
| --- | --- |
| Nye Report | Report of Zachary Nye, Ph.D attached as Exhibit F to ECF No. 275-2 |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INTRODUCTION

Plaintiffs' Motion for Class Certification should be denied.  Plaintiffs assert class claims under the Securities Act and Exchange Act.  However, they cannot certify a Securities Act class at all.  Their proposed class for Exchange Act claims fails because it is overbroad and does not match the claims the class may assert. And more generally, they face serious adequacy and typicality hurdles—hurdles that this Court has said make securities plaintiffs improper class representatives.

**Securities Act.**  Plaintiffs cannot certify a Securities Act class for several reasons.  *First*, Plaintiffs did not seek to assert any claims until after the Securities Act's one-year limitations period had run.  Their class claims thus are untimely under *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018).  In *China Agritech*, the Court held that when class certification is denied and the limitations period has run, a putative class plaintiff who has not stepped up before cannot suddenly "enter the fray" and "piggyback on an earlier, timely filed class action." *Id.* at 1806, 1808. Instead, his class claims are untimely and not saved by tolling. *Id.* So it is here.

*Second*, Plaintiffs' class definition impermissibly includes individuals who lack standing under the Securities Act.  Investors have standing to bring Securities Act claims only if their shares can be traced to the IPO.  *In re Century Alum. Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013).  Here, an investor's open-market sale on March 8, 2017 commingled IPO and non-IPO shares, destroying traceability for subsequent purchases.  This too is fatal to Plaintiffs' Motion because "'[n]o class may be certified that contains members lacking Article III standing.'" *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 594 (9th Cir. 2012).

*Third*, Plaintiffs' proposed class fails Rule 23's predominance requirement because their expert report does not clear the basic hurdles this Court articulated in *Loritz v. Exide Techs.*, 2015 WL 6790247, at *22 (C.D. Cal. July 21, 2015).  The report does not propose a specific damages model to calculate Section 11 damages under the Securities Act, or exclude confounding factors affecting the stock price.

**Exchange Act.** Plaintiffs' overbroad class definition fares no better under the Exchange Act. A securities class period cannot extend past the point it was reasonable for class members to rely on the alleged false statements. *Hayes v. MagnaChip Semiconductor Corp.*, 2016 U.S. Dist. LEXIS 177787, at \*24-25 (N.D. Cal. Dec. 22, 2016). Classes that extend beyond corrective disclosures are "unlikely to satisfy the predominance requirement . . . given the individual issues of purchaser knowledge and reliance that would arise." *In re SunEdison, Inc. Sec. Litig.*, 329 F.R.D. 124, 135 (S.D.N.Y. 2019). That is the issue here. Plaintiffs say key corrective disclosures occurred on April 10 and May 10, 2017. And yet they propose an undifferentiated class stretching until August 10, 2017—months after the market "learned the truth" and drove down the stock price, according to Plaintiffs. ¶¶ 13-14, 22. That will not do. The class would be riddled with individualized questions about knowledge, reliance, and damages.

**Adequacy & Typicality.** Separately, discovery has showed that Plaintiffs would be inadequate fiduciaries under any class definition. Their trades included day trading, short sales, and in-and-out sales, all of which have been held—including by this Court—to render a class representative atypical. Plaintiffs' testimony is also at odds with the allegations of the Complaint to which they signed on. Plaintiffs' depositions also revealed that they have abandoned this litigation in the hands of their counsel, who is driving this lawsuit.

In sum, the motion should be denied. The Court should not certify any class under the Securities Act. It should not certify the currently proposed class under the Exchange Act either. And if any Exchange Act class is ever certified in this case, it should be subdivided by dates corresponding to the alleged corrective disclosures.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.   Snap's IPO Shares Commingled with Non-IPO Shares

Snap conducted its IPO on March 2, 2017. RS at 5-6. Several banks served as underwriters to the IPO, purchasing all IPO shares from Snap at a slight discount

1   and then reselling them to the public at $17.  RS at 14-15.

2         As is customary in IPOs, existing shareholders of Snap entered into "lock-

3   up" agreements preventing them from selling their pre-IPO shares for a period after

4   the IPO.  RS at 11-14.  Lock-up agreements are a common way of ensuring that a

5   sudden supply of shares does not destabilize the stock price after a public offering.

6   Under the lock-up agreements with Snap, the earliest that existing shareholders

7   could sell their pre-IPO shares would have been 150 days after the IPO, on July 29,

8   2017.  *Id*.  Shareholders who acquired their stock pursuant to the vesting of

9   restricted stock units were also subject to lock-up agreements under their individual

10  grants.  *Id.*; Porwal Decl. ¶ 3.  These lock-up agreements could, however, be waived

11  at an earlier date by the lead underwriters.  RS at 8.

12        The lead underwriters granted such a waiver here.  On March 8, 2017, at his

13  request, a shareholder was granted a waiver for 100,000 shares of Class A common

14  stock issued to him before the IPO.  Thomas Decl. ¶ 4.  He sold the 100,000 shares

15  on the open market the same day.  *Id.* ¶ 5.  As of that date, Snap shares that had

16  been issued in the IPO became commingled with shares that had not been sold

17  pursuant to the IPO Prospectus.

18        **B.    First Lawsuit Filed While Stock Price Was Above IPO Price**

19        The first complaint in this action was filed on May 16, 2017, alleging

20  violations of Sections 11 and 15 of the Securities Act of 1933 and Sections 10(b)

21  and 20(a) of the Securities Exchange Act of 1934.  ECF No. 1.  On that date, Snap

22  shares were trading well above the IPO price—raising a question as to what

23  damages could possibly be alleged under Section 11.  Ex. 2.

24        On September 18, 2017, the Court appointed Thomas DiBiase as lead plaintiff

25  and KTMC as Lead Counsel.  ECF No. 54.  On November 1, 2017, Mr. DiBiase,

26  joined by plaintiff David Steinberg, filed a complaint alleging that Defendants failed

27  to disclose: (1) a slowdown in Snap's growth caused by Instagram competition; (2)

28  a lawsuit filed by former Snap employee Anthony Pompliano; and (3) that Snap had

1  been boosting user engagement by what plaintiffs referred to as "growth hacking."
2  ECF No. 67.

3      **C.    Lead Counsel's Failed Attempt to Substitute the Lead Plaintiff**

4      Mr. DiBiase and Mr. Steinberg served as proposed class representatives for
5  more than a year.  In late 2018, however, both disappeared from the case.  On
6  August 30, 2018, Lead Counsel moved for class certification, ECF No. 114, and to
7  withdraw Mr. Steinberg and substitute Donald R. Allen and Shawn B. Dandridge
8  as class representatives.  ECF No. 115.  Weeks later, KTMC abruptly cancelled
9  Mr. DiBiase's deposition on the eve of its noticed date and then withdrew him as
10 lead plaintiff.  KTMC sought to substitute in Allen and Dandridge.  ECF No. 118.

11     On January 10, 2019, the Court rejected KTMC's lead plaintiff substitution.
12 ECF No. 208.  The Court also denied plaintiffs' motion for class certification and
13 reopened the lead plaintiff appointment process.  *Id.*  The Court correctly observed
14 that the purported substitution of plaintiffs could only be seen as a bid to circumvent
15 the PSLRA's lead plaintiff appointment process.  *Id.* at 3-4.  The Court held that the
16 action could not continue unless new parties came forward: "The withdrawals of
17 DiBiase and Steinberg means that the putative class lacks both any Named Plaintiffs
18 and also (and more importantly) a Lead Plaintiff."  *Id.* at 4.

19     **D.    New Lead Plaintiffs, With the Same Lead Counsel**

20     After the Court allowed DiBiase and Steinberg to withdraw and denied the
21 motion to certify the class, seven candidates filed motions seeking to be appointed
22 lead plaintiffs.  ECF Nos. 209, 210, 213-215, 219, 222.  The seven candidates
23 included individuals who had been part of this lawsuit from its inception, and had
24 previously sought to become lead plaintiffs, like Mr. Gupta.  ECF Nos. 15, 21, 25.

25     Several other candidates had no prior connection with this lawsuit.  Among
26 them was the "Snap Shareholder Group," comprised of five unrelated investors
27 cobbled together by counsel:  Smilka Melgoza, Rediet Tilahun, Tony Ray Nelson,
28 Rickey E. Butler, and Alan L. Dukes.  ECF No. 219.  None of the individuals in the

1  Snap Shareholder Group previously had filed a complaint, sought to be lead
2  plaintiff, or sought to intervene in this action.  Their lead plaintiff application was
3  the first time they asserted claims.  Other lead plaintiff candidates noted that as a
4  result, the Snap Shareholder Group's claims were time-barred by the Securities
5  Act's one-year statute of limitations.  ECF No. 242 at 23-25, 32-33; *see also* ECF
6  No. 237 at 13 (warning that, under *China Agritech*, the pendency of Mr. DiBiase's
7  putative class action did not toll the statute of limitations for new plaintiffs).

8       On April 1, 2019, after rejecting two other candidates with higher losses,
9  including one whose claims were not time-barred, the Court appointed the Snap
10 Shareholder Group as Lead Plaintiff and KTMC as Lead Counsel.  ECF No. 262.

11      On May 29, 2019, Plaintiffs filed a Second Consolidated Amended Class
12 Action Complaint (the "Complaint").  ECF No. 272.  In the Complaint, they state
13 that one alleged omission—the allegations in the Pompliano lawsuit—became
14 known to the market no later than April 10, 2017, when an unredacted version of
15 Pompliano's complaint was filed.  ¶ 163.  They also allege that misrepresentations
16 regarding Snap's user growth became publicly known on May 10, 2017, when Snap
17 publicly disclosed that its growth rate was slowing (e.g., ¶¶ 168-170, 270-271), and
18 analysts and market commentators attributed that decline to competition from
19 Instagram Stories (e.g., ¶¶ 171-172, 270(d), 271).  Despite alleging that the "truth"
20 of these misrepresentations was revealed on April 10, 2017 and May 10, 2017,
21 Plaintiffs extended the definition of their putative class to August 10, 2017.  ¶ 22.

22      On June 7, 2019, Plaintiffs moved for class certification.

<strong>ARGUMENT</strong>

23

24 **I.    PLAINTIFFS MAY NOT MAINTAIN A SECURITIES ACT CLASS**

25      **A.    Plaintiffs' Securities Act Class Claims Are Time-Barred**

26      Plaintiffs' Motion should be denied because their Securities Act class claims
27 are time-barred.  In *China Agritech*, 138 S. Ct. 1800, the Supreme Court held that
28 when class certification is denied and the limitations period on the underlying claim

has expired, a new plaintiff cannot emerge for the first time and bring a class claim—that class claim is untimely and is not saved by tolling.  As the Court put it, tolling rules "do[ ] not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier, timely filed class action." *Id.* at 1806.  A new plaintiff cannot "enter the fray several years after class proceedings first commenced." *Id.* at 1808.  So it is here.  None of the Plaintiffs brought any claims—let alone sought to serve as class representative—before the Securities Act's one-year statute of limitations expired.  Under *China Agritech*, they arrived too late.  Their effort to litigate Securities Act claims on a class-wide basis is untimely.

**No Class Claims after Limitations Period.**  Decided last year, *China Agritech* involved securities claims governed by the PSLRA, just like this action. *Id.* at 1801-02.  There, a set of plaintiffs sought to certify a class bringing Exchange Act claims after the statute of limitations expired.  *Id.* at 1802.  Plaintiffs asserted that the statute of limitations had been tolled by two prior unsuccessful class actions in which they had been unnamed putative class members, invoking *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974). *Id.*

The Supreme Court disagreed.  It acknowledged that, pursuant to *American Pipe*, an absent class member may intervene in a suit after class certification has been denied in order to press his *individual* claims, even if the statute of limitations has expired.  *China Agritech*, 138 S. Ct. at 1806.  Such claims are tolled, the Court explained, to ensure that class members do not lose their individual remedy in the event the purported class fails.  *Id.*  But the Court emphasized that such tolling does not "extend[] to otherwise time-barred *class* claims." *Id.* (emphasis added).  The Court held that "*American Pipe* does not permit a plaintiff who waits out the statute of limitations to piggyback on an earlier, timely filed class action." *Id.*

The Supreme Court emphasized the categorical scope of its rule:  A plaintiff who has "wait[ed] out the statute of limitations," and watched as certification is denied, may not then seek to certify a class—period.  *Id.*  That is so even where the

prior certification motion was denied based on a lead plaintiff's inadequacy, as opposed to a class defect. *Id.* at 1809 & n.5. Parting with the majority, Justice Sotomayor's concurrence advocated against the majority's "blanket no-tolling-of-class-claims-ever rule" and argued for a more limited holding that would deny tolling only where a court denied certification based on defects in the class, rather than the class representative. *Id.* at 1814 (Sotomayor, J., concurring). Justice Ginsburg, writing for the eight-Justice majority, rejected such a limitation, holding that "Rule 23 and putative class members' own interests in adequate representation, and the efficient adjudication thereof, weigh heavily against tolling" class claims in *any* circumstance. *Id.* at 1809 n.5. That was so because requiring potential class representatives to come forward early, and "affording district courts time to consider competing claims for class representation[,] will advance the likelihood that lead plaintiff or class counsel deficiencies will be discovered and acted upon early in the litigation." *Id.* The Court held that denying tolling promotes "efficiency" by ensuring that "the district court can select the best plaintiff" at the outset "with knowledge of the full array of potential class representatives and class counsel." *Id.* at 1807.

The Court gave detailed reasons for its rule. It observed that "[e]ncouraging early class filings" increases the chances that "sufficient time remains under the statute of limitations, in the event that certification is denied" so that a "new plaintiff might intervene" to serve as class representative before time expires. *Id.* at 1807 n.2. It wrote that basic principles of equity dictate that plaintiffs cannot be permitted to "sle[ep] on their rights" by asserting their "interest in representing the class" only after the statute of limitations has run. *Id.* at 1808. Finally, it emphasized that if tolling was permitted for class claims, the statute of limitations would be frustrated entirely: "[A]s each class is denied certification, a new named plaintiff could file a class complaint that resuscitates the litigation." *Id.*

1     **Plaintiffs' Securities Act Class Claims Are Time-Barred.**  Here, none of

2    the seven Plaintiffs participated in the initial lead plaintiff selection process, filed

3    class claims, or made any other attempt to assert their interest in serving as a class

4    representative until after the statute of limitations had expired.  Their Securities Act

5    class claims therefore are time-barred.  As *China Agritech* held, "*American Pipe*

6    does not permit a plaintiff who waits out the statute of limitations to piggyback on

7    an earlier, timely filed class action."  138 S. Ct. at 1806.

8        The Securities Act has a limitations period of one year.  15 U.S.C. § 77m.

9    The first complaint in this case was filed on May 16, 2017.  ECF No. 1.  Because

10   court filings are matters of public record, all potential plaintiffs had notice of their

11   claims by that date at the latest and the statute of limitations was triggered.  *Pension*

12   *Tr. Fund for Operating Eng'rs v. Mortg. Asset Sec. Trans., Inc.*, 730 F.3d 263, 278

13   (3d Cir. 2013).  The limitations period thus expired on May 16, 2018.  Indeed, even

14   if the Court deemed that the statute of limitations was not triggered until the last

15   alleged "corrective disclosure" of August 10, 2017 (and the end of the proposed

16   class period), ¶ 22, Plaintiffs' class claims would still be untimely because none of

17   them stepped forward until after August 10, 2018.

18        Two of them—Allen and Dandridge—first tried to join the action on August

19   30, 2018.  ECF No. 115.  The remaining five, who constitute the "Snap Shareholder

20   Group," did not seek to join the case until January 31, 2019, when they filed a lead

21   plaintiff motion.  ECF No. 219.  That was at least eight months after the statute of

22   limitations expired.  Under *China Agritech*, their delay dooms their class claims

23   because a plaintiff who has "wait[ed] out the statute of limitations," and watched as

24   certification is denied, may not then seek to certify a class.  138 S. Ct. at 1806.

25    **Plaintiffs May Not Evade the Time Bar.**  Despite being aware of *China*

26   *Agritech* and their inability to maintain Securities Act class claims, *see supra* at 5,

27   Plaintiffs did not address this critical issue in their Motion.  No doubt, for the first

28   time in their reply, Plaintiffs will attempt to circumvent *China Agritech*.  They

1    cannot evade its clear holding that their Securities Act class claims are time-barred.

2         To be sure, the plaintiffs in *China Agritech* sought to file a new class action,

3    whereas here Plaintiffs seek to resuscitate class claims within an existing suit.  That

4    is a distinction without a difference.  Once certification is denied, a suit is "stripped

5    of its character as a class action" and the case "becomes a nonclass action." Fed. R.

6    Civ. P. 23(c)(1), advisory cmt. note to 1966 amendment; *Armstrong* v. *Martin*

7    *Marietta Corp.*, 138 F.3d 1374, 1381 (11th Cir. 1998) (quoting same).  "At that

8    point, class members may choose to file their own suits or to intervene as plaintiffs

9    in the pending action."  *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354

10   (1983).  But in either scenario, the availability of tolling does not turn on "the

11   method class members choose to enforce their rights upon denial of class

12   certification." *Id.* at 353.

13        Accordingly, even before *China Agritech*, courts had held that a plaintiff's

14   late-filed class claims are untimely, even when he tries to mask that untimeliness by

15   joining or intervening in an existing putative class action rather than filing a new

16   one.  *See Griffin v. Singletary*, 17 F.3d 356, 359 (11th Cir. 1994) (plaintiffs' claims

17   time-barred where they tried to intervene as class representatives for a decertified

18   class); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1351

19   (5th Cir. 1985) (same; time-barred intervenors could not "piggyback" on pending

20   class action where certification had been denied);  *In re Wells Fargo Mortg.-Backed*

21   *Certificates Litig.*, 2010 U.S. Dist. LEXIS 124498, at *15-27 (N.D. Cal. Oct. 19,

22   2010) (claims of new plaintiffs added through amended complaint were untimely

23   because they were brought after the Securities Act's one-year limitations period).

24        Nor can there be any doubt that the Supreme Court intended its holding in

25   *China Agritech* to apply both to new class complaints and amended complaints filed

26   within an existing action.  To begin with, that is the only reading that can be

27   squared with the decision's language.  In *China Agritech*, the Court noted that its

28   rule increases the chance that certification motions will be decided early in a case,

while "*sufficient time remains under the statute of limitations*" so that "*a new plaintiff might intervene*" to resuscitate the class if the initial certification motion is denied.  138 S. Ct. at 1807 n.2 (emphasis added).  That can only mean that a "new plaintiff" is barred from intervening to serve as a class representative if "sufficient time" no longer "remains under the statute of limitations."  *Id.*

Moreover, none of the rationales the Supreme Court offered for its rule would make sense if an unnamed plaintiff could press class claims within an existing suit after the statute of limitations expired.  The "efficiency" benefits that result from a rule encouraging all potential class representatives to come forward early, *id.* at 1807-08, may be realized only if unnamed putative class members are barred from pressing class claims in *any* suit after the statute of limitations has expired.  Late-arriving plaintiffs have "slept on their rights," *id.* at 1808—in precisely the way *China Agritech* condemned—whether they belatedly volunteer to serve as class representatives in a new or existing suit.  Permitting such belated action in an existing case leads to the very scenario the Supreme Court sought to avoid: an unending string of unsuccessful class certification proceedings where, "as each class is denied certification, a new named plaintiff" comes to the fore.  *Id.*

Courts of appeals implementing *China Agritech* have rejected attempts to distinguish the case through exceptions that would "swallow" its bright-line rule.  In *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Forest Pharm., Inc.*, 915 F.3d 1 (1st Cir. 2019), the First Circuit held that *China Agritech* prohibited the tolling of class claims even when there had been "no substantive ruling on class certification" in the prior case.  *Id.* at 16.  The First Circuit observed that *China Agritech* "effectively ruled that the tolling effect of a motion to certify a class applies only to individual claims, no matter how the motion is ultimately resolved. To hold otherwise would be to allow a chain of withdrawn class-action suits to extend the limitations period forever."  *Id.* at 17.  Similarly, in *Blake v. JP Morgan Chase Bank N.A.*, 2019 U.S. App. LEXIS 18370, at *17-20 (3d Cir. June 19, 2019),

the Third Circuit rejected plaintiffs' attempt to use a prior, unsuccessful class action to toll untimely class claims where the prior action was still pending when plaintiffs' (otherwise untimely) suit was filed. *Blake* held that accepting that distinction would be "at odds with *China Agritech*'s logic" because permitting the new class claims to go forward would "encourage more plaintiffs to seek second bites at the apple," while permitting plaintiffs to "sle[ep] on their rights," and opening up the possibility of "endless tolling." *Id.* at *20.

District Courts have similarly rejected attempts to circumvent *China Agritech*'s rule. *See Practice Mgmt. Support Servs. v. Cirque du Soleil Inc.*, 2018 U.S. Dist. LEXIS 129633, at *10-11 (N.D. Ill. Aug. 2, 2018) (*China Agritech* "repeatedly stated its holdings in clear terms that were in no way qualified"); *Woodall v. Cty. of Wayne*, 2019 U.S. Dist. LEXIS 50186, at *8-10 (E.D. Mich. Mar. 26, 2019) (no tolling of class claims even where prior class certification motion denied without prejudice); *Armendariz v. Santa Fe Cty. Bd. of Comm'rs*, 331 F. Supp. 3d 1245, 1249 (D.N.M. 2018) (holding *China Agritech* prohibited untimely class claims even though class certification was not denied in an earlier action).

Plaintiffs in this case are in a particularly weak position because—like the *China Agritech* plaintiffs—they are attempting to assert claims governed by the PSLRA. That statute requires plaintiffs to notify potential class members once a class action is filed, and mandates that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff[.]" 15 U.S.C. § 78u-4(a)(3). As *China Agritech* explained, "[w]ith notice and the opportunity to participate" in the lead plaintiff selection process, "there is little reason to allow [PSLRA] plaintiffs who passed up these opportunities to enter the fray" after the limitations period has expired. 138 S. Ct. at 1808. Even Justice Sotomayor's concurrence acknowledged that, in light of the statute's procedures, the "failure to utilize the PSLRA's lead-plaintiff selection procedure" should render a lead plaintiff ineligible to press class claims after the

1   statute of limitations has expired.  *Id.* at 1812 (Sotomayor, J., concurring).

2          Here, Lead Counsel tried to rectify the mysterious disappearance of its prior

3   lead plaintiff by filing the same claims anew on behalf of a fresh set of individuals,

4   previously unaffiliated with this action.  But *China Agritech* bars these new

5   Plaintiffs from asserting class-wide Securities Act claims at this late stage.

6          **B.     Any Securities Act Class Must Be Limited to Purchasers Who**
            **Can Trace Their Stock to the IPO**
7

8          Even if Plaintiffs could maintain a Securities Act class—which they cannot—

9   that class would have to be limited to purchasers who bought Snap stock between

10  March 2 and 7, 2017.  Those who bought Snap shares on or after March 8, 2017

11  cannot trace their stock back to the IPO due to an influx of non-IPO shares into the

12  market.

13         To have standing to bring Securities Act claims, plaintiffs must show either

14  that they bought shares from the underwriters, in the IPO itself, or trace their shares

15  back to those sold by the underwriters.  *Century Alum.*, 729 F.3d at 1106 (citing 15

16  U.S.C. § 77k).  Tracing "require[s] plaintiffs to trace the chain of title for their

17  shares back to the [challenged] offering[.]"  *Id.*  In modern practice, however,

18  shares are not based on paper certificates; rather, they are entirely fungible and once

19  commingled, cannot be told apart.  The Ninth Circuit has recognized that, given

20  these modern realities, tracing "is 'often impossible,' because 'most trading is done

21  through brokers who neither know nor care whether they are getting newly

22  registered or old shares,' and 'many brokerage houses do not identify specific

23  shares with particular accounts but instead treat the account as having an undivided

24  interest in the house's position.'"  *Id.* at 1106-07; *see also Perrin v. Southwest*

25  *Water Co.*, 2014 U.S. Dist. LEXIS 185165, at *5 (C.D. Cal. July 2, 2014) (modern

26  clearinghouse "holds deposited securities in 'fungible bulk,' such that its

27  participants do not own specifically identifiable shares").  And tracing actual chain

28  of title cannot be replaced by statistical likelihood: a plaintiff cannot assert standing

1    under the Securities Act by claiming that *most* of the shares in the marketplace were

2    issued pursuant to the challenged offering.  *Krim v. PCOrder.com*, 402 F.3d 489,

3    496-97 (5th Cir. 2005) (rejecting 90% likelihood that shares could be traced to

4    offering); *In re Quarterdeck Office Sys., Inc. Sec. Litig.*, 1993 U.S. Dist. LEXIS

5    19806, at *7-10 (C.D. Cal. Sept. 30, 1993) (denying class certification where

6    probability that stock was purchased in the offering was 97%).  The Ninth Circuit

7    has explained that "[t]hough difficult to meet," "this tracing requirement is the

8    condition Congress has imposed for granting access to the 'relaxed liability

9    requirements' [Section] 11 affords."  *Century Alum.*, 729 F.3d at 1104, 1107.

10        Recognizing that tracing is often impossible, courts routinely narrow

11   Securities Act classes to the period in which the only stock on the market were

12   shares issued in the offering.  *E.g.*, *In re LendingClub Sec. Litig.*, 282 F. Supp. 3d

13   1171, 1188 (N.D. Cal. 2017) (narrowing class definition to end on date lock-up

14   agreements expired and non-IPO shares entered the market); *Tsirekidze v. Syntax-*

15   *Brillian Corp.*, 2009 U.S. Dist. LEXIS 61145, at *23 (D. Ariz. July 17, 2009)

16   (restricting Securities Act class to "exclude all purchasers that did not buy their

17   stock on the day of the SPO directly from an underwriter or participating dealer").

18        Here, non-IPO shares entered the market on March 8, 2017, when a private

19   investor sold 100,000 of his pre-IPO shares, which were *not* issued pursuant to the

20   IPO Prospectus.  Thomas Decl. ¶¶ 4, 5.  Therefore, the pool of Snap shares

21   available for purchase on and after March 8, 2017, contained a mix of

22   indistinguishable, commingled IPO and non-IPO shares.  Individuals who bought

23   shares after that date will not be able to prove standing under the Securities Act.  As

24   a result, the proposed class may not be certified as currently defined.  Indeed, courts

25   of appeals have held that a district court abuses its discretion where it certifies a

26   class that does not distinguish between direct purchasers in the IPO and aftermarket

27   purchasers who must trace their purchases to the IPO.  *In re Petrobras Sec. Litig.*,

28   862 F.3d 250, 267-73 (2d Cir. 2017); *accord Junod v. NWP Servs. Co.*, 2016 U.S.

1  Dist. LEXIS 195195, at *15 (C.D. Cal. July 18, 2016) ("[c]ourts in this circuit have

2  consistently denied certification where class definitions include both harmed and

3  unharmed members"). To the extent a Securities Act class is ever certified in this

4  case, that class must be restricted to Snap purchasers between March 2 and March

5  7, 2017.

6        **C.    The Proposed Class Fails Predominance because Statutory**

7               **Damages under the Securities Act Cannot Be Calculated**

8        The Court should also deny certification because the proposed class fails to

9  satisfy Rule 23(b)(3). Under the Rule, plaintiffs must show that damages are

10  capable of class-wide measurement—and to do that, as this Court has explained,

11  they must tie their damages methodology to their theory of liability and show their

12  damages stemmed from defendants' actions. *Loritz v. Exide Techs.*, 2015 WL

13  6790247, at *3 (C.D. Cal. July 21, 2015) (Wilson, J.). Plaintiffs have failed to do

14  so here. First, their damages expert failed to identify any specific damages model.

15  Second, damages *cannot* be calculated until the Court determines the lawsuit's

16  starting date, which affects the statutory damages formula.

17        **1.    Applicable Law**

18        Rule 23(b)(3) requires that "questions of law or fact common to class

19  members predominate over any questions affecting only individual members, and

20  that a class action is superior to other available methods for fairly and efficiently

21  adjudicating the controversy." Plaintiffs thus must show that "damages are capable

22  of measurement on a classwide basis" and tie their damages model to their theory of

23  liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013). In *Comcast*, the

24  Supreme Court required that "a model purporting to serve as evidence of damages

25  in this class action must measure only those damages attributable to that theory."

26  *Id.* at 35. It explained that "[i]f the model does not even attempt to do that, it cannot

27  possibly establish that damages are susceptible of measurement across the entire

28  class for purposes of Rule 23(b)(3)." *Id.*

1    In *Loritz*, this Court applied *Comcast* to require plaintiffs to tie their damages

2    methodology to their theory of liability and show that the proposed damages

3    stemmed specifically from the defendants' actions.  2015 WL 6790247, at *3.  The

4    Court held that plaintiffs did not satisfy Rule 23(b)(3) where their expert failed to

5    set forth a model of damages and only discussed "general techniques" without

6    "t[ying] these theories to the facts of this case or to each other—in other words, he

7    fail[ed] to propose one model explaining how he would use these techniques in

8    concert to calculate damages in this case."  *Id.* at *22.  Other courts have similarly

9    required plaintiffs to identify an actual model of damages tied to their theory of

10   liability.  *See In re POM Wonderful LLC Mktg. & Sales Practice Litig.*, 2014 WL

11   1225184, at *5 (C.D. Cal. Mar. 25, 2014) (decertifying class where the court could

12   not "conduct the required 'rigorous analysis' where there is nothing of substance to

13   analyze"); *Werdebaugh v. Blue Diamond Growers*, 2014 WL 7148923, at *14

14   (N.D. Cal. Dec. 15, 2014) ("[T]he Court is obligated to do more than rubberstamp a

15   proposed damages class merely because a plaintiff's expert purports to have used a

16   peer reviewed methodology such as a regression analysis."); *Fort Worth Emps.'*

17   *Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 141 (S.D.N.Y. 2014)

18   (denying class certification where plaintiff's expert "ha[d] not created such a

19   [damages] model to date").

20          **2.    Plaintiffs' Expert Fails to Identify an Actual Model**

21          Contrary to the requirement of *Loritz* and other cases, Dr. Nye's report

22   contains no damages model.  Instead, it states, in conclusory terms, that an event

23   study *could* calculate price inflation to determine "value" and measure damages:

24   "price inflation present in Snap stock during the Class Period may be measured on a

25   Class-wide basis using a commonly applied event study of the change in the stock's

26   price caused by the alleged corrective events."  Nye Rep. ¶ 62.  Dr. Nye describes

27   his speculative event study as "analyzing the change in a security's price caused by

28   a corrective disclosure and/or the materialization of a concealed risk."  *Id.* at ¶ 57.

1  But he provides no explanation of how his proposal would actually function.  As
2  this Court has recognized, the failure to set forth an actual model of damages in a
3  securities case is "particularly problematic" where, as here, "there are multiple
4  alleged misrepresentations[.]"  *Loritz*, 2015 WL 6790247, at *22.

5      Because Dr. Nye failed to identify a damages model, he also failed to account
6  for factors unrelated to the alleged misrepresentations that affected Snap's stock
7  price.  *See POM Wonderful,* 2014 WL 1225184, at *5 (rejecting model that
8  "assumed that 100% of that price difference was attributable to Pom's alleged
9  misrepresentations"); *Werdebaugh*, 2014 WL 7148923, at *13 (finding model
10  "incapable of providing a damages figure that is consistent with Plaintiff's liability
11  case" when it was unclear whether price fluctuations resulted from several factors).

12      Dr. Nye concedes that stock prices can and do fluctuate for reasons unrelated
13  to alleged securities fraud: "Other factors can include changes in market and
14  industry conditions or the dissemination of material, non-fraud-related, Company
15  specific information."  Nye Rep. ¶ 57.  But he provides no explanation for how to
16  account for such factors, concluding only that his potential model *could* "isolate
17  Company-specific price movement caused by the revelation of true facts related to
18  the alleged fraud from price movement caused by other factors."  *Id.*  Without
19  knowing how Dr. Nye accounts for these confounding factors, the class cannot tie
20  any losses to the alleged omissions.  *See, e.g.*, *Loritz*, 2015 WL 6790247, at *22
21  ("Plaintiffs fail to show a damages theory tied to their theory of liability"); *POM*
22  *Wonderful*, 2014 WL 1225184, at *5 (rejecting plaintiff's model that did not "draw
23  any link between [the Company's] actions and the price difference"); *Werdebaugh*,
24  2014 WL 7148923, at *12 (plaintiff "failed to show that his proposed 'damages
25  stemmed from the defendant's actions that created the legal liability.'").

26      In sum, unable to identify a specific model of damages and unable to account
27  for confounding factors, Dr. Nye's report falls short of the "evidentiary proof"
28  required for class certification.  *See Werdebaugh*, 2014 WL 7148923, at *14.

**3.    Predominance Cannot Be Established Until the Court Determines "The Time [the] Suit Was Brought"**

Moreover, no specific damages model can exist until the Court determines the starting date of this lawsuit.  Section 11 provides a statutory formula for damages, 15 U.S.C. § 77k(e), and, as the Ninth Circuit has explained, an established date of "'the time such suit was brought'" is necessary to determine how such damages are measured.  *In re Broderbund/Learning Co. Sec. Litig.*, 294 F.3d 1201, 1203-04 (9th Cir. 2002) ("[D]amages must be 'measured by the difference between the amount paid for the security and its price at either the time it was sold or *the date the Section 11 claim was filed*.'" (emphasis added)); *see also In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 2010 U.S. Dist. LEXIS 142992, at *54-55 (W.D. Wash. Oct. 12, 2010) (calling *Broderbund* "binding Ninth Circuit authority" and holding that "damages are calculated in this case as the difference between the price paid and the price on the date the suit was filed").

Dr. Nye agrees there is no way to calculate damages until the Court decides the date of the first-filed complaint.  His report states that damages could be calculated in multiple ways depending on the date of the first-filed complaint: "[I]f it is determined that the relevant Section 11 suit date in this matter occurred on or prior to August 10, 2017 . . . then the value of Snap stock on such date can be estimated as the closing price of the stock minus the price inflation present in the stock that day.  Otherwise, if it is determined that the relevant suit date occurred after August 10, 2017 . . . then the value of Snap stock on such date is simply the closing price of the stock that day."  Nye Rep. ¶ 62.

Without a date for the first-filed complaint, the damages in Nye's report range from a value computed with a first-filed complaint date of May 16, 2017 to another value based on a first-filed date of November 1, 2017.  *See id.*  Nye's report admits that damages cannot be calculated without a first-filed date.  A class should not be certified when damages are not calculable class-wide.  Defendants submit

1  that "the time [this] suit was brought" necessarily is the date of the first-filed

2  complaint, May 16, 2017, and  the "value" for damages calculation should be

3  measured by the price of the stock on May 16, 2017.  *See* ECF Nos. 86, 88.

4  **II.      ANY EXCHANGE ACT CLAIMS MUST BE NARROWED**

5          Plaintiffs' Exchange Act class claims fare no better than their Securities Act

6  claims, due to the proposed class' overbreadth.  A securities class period cannot

7  extend past the date of reasonable reliance on defendants' allegedly false

8  statements.  *Hayes*, 2016 U.S. Dist. LEXIS 177787, at *24-25; *SunEdison*, 329

9  F.R.D. at 130.  And yet, the class proposed here extends far beyond the dates when,

10 according to Plaintiffs, the market received key corrective disclosures.  The Motion

11 to certify such an overbroad class should be rejected.  And if the Court were to

12 certify a class for Exchange Act claims, it should be subdivided and narrowed.

13     **A.      Class Periods in Securities Actions Are Limited by the Alleged**

14             **Corrective Disclosures**

15          In a securities class action, the class period cannot extend past the point it

16 was reasonable for class members to rely on the allegedly false statements.  *Hayes*,

17 2016 U.S. Dist. LEXIS 177787, at *24-25; *SunEdison*, 329 F.R.D. at 130.  Courts

18 regularly hold that once a company has publicly disclosed information that reveals

19 the supposed prior misstatements, purchasers have actual knowledge and the class

20 period must end.  *E.g.*, *SunEdison*, 329 F.R.D. at 134 ("Critically, the Complaint

21 itself alleges that the 10-Q 'disclosed' and 'revealed' the putatively omitted and

22 misstated information"); *Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521

23 (S.D.N.Y. 2018) ("even according to Plaintiff's own allegations, putative plaintiffs

24 purchasing or acquiring Inovalon stock after that date [of a news release] would

25 have actual knowledge of Inovalon's purported misrepresentations and omissions").

26          Courts routinely subdivide and narrow such overbroad classes.  In

27 circumstances similar to this case, in *SunEdison*, plaintiffs sough to inflate the

28 quantum of damages by trying to certify a single shareholder class of all people

1    with claims under either the Securities Act or the Exchange Act.  329 F.R.D. 124.

2    The court held that the proposed class definition was "overbroad in light of the

3    different theories of liability advanced for plaintiffs' claims under the Securities Act

4    and the Exchange Act."  *Id.* at 130.  The court noted that "[t]he proposed class

5    period for the Securities Act claim also extends beyond the date of statements that

6    plaintiffs have themselves described as disclosures of the omitted material

7    information."  *Id.*  The court resolved the issue by "exercis[ing] its discretion under

8    Rule 23 to divide the single class into two subclasses: one pursuing relief under the

9    Securities Act and a second pursuing relief under the Exchange Act."  *Id.*

10         **B.    Plaintiffs Admit that Corrective Disclosures Were Made before**
           **the End of the Proposed Class Period**
11

12         Here, the proposed class suffers from the same deficiencies as in *SunEdison*.

13   Plaintiffs' core allegation is that Snap knew Instagram Stories was hurting its user

14   growth rate but did not sufficiently reveal that fact, or the slower trend, to the

15   market.  ¶¶ 6-9.  But as Plaintiffs themselves allege, on May 10, 2017, Snap

16   disclosed that its rate of user growth was slowing (¶¶ 168-170, 270-271), and

17   analysts attributed that decline to competition from Instagram Stories (¶¶ 171-172,

18   270(d), 271).  The Complaint leaves no doubt as to the market takeaway of the May

19   10, 2017 disclosure: "*[m]arket commentators uniformly attributed Snap's slowing*

20   *user growth to direct competition from Instagram.*"  ¶ 171 (emphasis added).  As in

21   *SunEdison*, "the Complaint itself alleges that the 10-Q 'disclosed' and 'revealed'

22   the putatively omitted and misstated information."  329 F.R.D. at 134.  Thus "even

23   according to Plaintiff's own allegations, putative plaintiffs purchasing or acquiring

24   [Snap] stock after that date would have actual knowledge of [Snap]'s purported

25   misrepresentations and omissions."  *Xiang*, 327 F.R.D. at 521.

26         Similarly, Plaintiffs admit that the existence of the Pompliano lawsuit was

27   known to the market no later than April 10, 2017, when an unredacted version of

28   Pompliano's complaint was filed.  ¶ 163.  That was four months before the end of

the proposed class period.  Plaintiffs have alleged no subsequent disclosures regarding the Pompliano lawsuit after April 10, 2017.  (Pompliano's allegations were, in fact, widely known as early as January 2017.  ¶ 158; Ex. 3).  As a result of these disclosures, individual questions of knowledge and reliance would arise if the class were to extend beyond April 10, 2017 (for Pompliano), and May 10, 2017 (for the impact of competition).

In fact, this is the very argument that Plaintiffs used to disqualify the other lead plaintiff candidates.  *See* ECF Nos. 241, 247.  Plaintiffs twice argued that lead plaintiff candidate Gupta, whose alleged losses were larger and exceeded $1 million, would be subject to unique defenses because he had purchased a significant number of his shares after the May 10, 2017 corrective disclosure.  ECF No. 37 at 9-10; ECF No. 247 at 25-26.  Plaintiffs noted that Mr. Gupta "was on 'notice of defendants' misstatements and omissions' and may not be able 'to assert the fraud-on-the-market presumption of reliance.'"  ECF No. 247 at 26.  The Court agreed on both occasions.  When initially rejecting Mr. Gupta's candidacy for lead plaintiff, the Court held that "after news surfaced questioning the strength of the Company's daily active user growth" on May 10, 2017, Mr. Gupta's "post-corrective trading might expose Gupta to unique defenses regarding whether Gupta actually relied on any alleged misrepresentations by Snap."  ECF No. 54 at 4.  The second time, the Court again rejected Gupta's lead plaintiff application, finding that his post-disclosure purchases would undermine the fraud-on-the market presumption of reliance.  ECF No. 262 at 2-3.  The Court also rejected lead plaintiff candidate NMSIC, which had also purchased 15% of its holdings after May 10, 2017.  *Id.* at 5.

The same considerations that the Court adopted for determining the adequacy of lead plaintiff candidates apply equally to members of the putative class.  They limit the class periods that may be certified for omissions that were allegedly revealed in April and May 2017.

1

**C.      Subsequent Alleged Disclosures Do Not Alter the
Unreasonableness of Class Members' Reliance after May 10, 2017**

2

3      The rationale for shortening the class period is not altered by subsequent,

4   confirmatory disclosures after May 10, 2017.  Plaintiffs allege subsequent

5   disclosures on (1) June 7, 2017, when a SensorTower report indicated that Snapchat

6   download rates were slower than the previous year (¶ 187); (2) July 11, 2017, when

7   Morgan Stanley lowered its price target for Snap stock (¶ 190); and (3) August 10,

8   2017, when Snap disclosed the second consecutive quarter of slower DAU growth,

9   which analysts again linked to increased competition from Instagram (¶¶ 193, 200).

10      These subsequent disclosures do not alter Plaintiffs' admission that the

11   market understood as early as May 10, 2017, that "commentators uniformly

12   attributed Snap's slowing user growth to direct competition from Instagram." ¶

13   171.  As the court explained in *In re Fannie Mae Sec. Litig.*, 247 F.R.D. 32, 40

14   (D.D.C. 2008), the proposed class needs to be shortened because, "[w]hile

15   additional information did enter the market after December 22, 2004, those

16   additional disclosures did not render the December [22] statement either misleading

17   or any less corrective."  The court reasoned that "investors who purchased Fannie

18   Mae stock after December 22, 2004, stand in a different posture than those who

19   purchased beforehand, and should not be able to claim a reasonable reliance on

20   Fannie Mae's financial statements." *Id.*

21      Similarly, here, the subsequent disclosures alleged by Plaintiffs simply show

22   that negative developments in Snap's user metrics *continued* and that the market

23   *continued* to attribute those developments to Instagram.  Such confirmatory

24   disclosures do not warrant extending the class period.  *See In re Nature's Sunshine*

25   *Product's Inc.*, 251 F.R.D. 656, 666 (D. Utah 2008) (disclosures of "additional

26   adverse information," and disclosure "reiterating" prior information did not make

27   investors' continued reliance reasonable); *W. Va. Pipe Trades Health & Welfare*

28   *Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 295 (D. Minn. 2018) (shortening class

1   period where analyst reports covered same information as earlier disclosure).

2   **III.   PLAINTIFFS ARE ATYPICAL AND INADEQUATE**

3   The Court should also deny class certification, for both Securities Act and

4   Exchange Act claims, because the proposed seven class representatives cannot fairly

5   represent the putative class.  Testimony and trading patterns have demonstrated that

6   several proposed class representatives are not "typical of the claims and defenses of

7   the class."  Fed. R. Civ. P. 23(a)(3).  In addition, the proposed class representatives

8   have abdicated leadership of the lawsuit to their counsel and cannot "adequately

9   protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).

10  **A.   The Proposed Class Representatives Are Subject to Unique
            Defenses Regarding Their Reliance**

11

12  The Ninth Circuit has held that Plaintiffs are atypical when they are subject to

13  "'unique defenses'" regarding their "reliance on the integrity of the market."  *Hanon*

14  *v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Plaintiffs are subject to

15  two such unique defenses.

16  First, the trading patterns of several proposed class representatives render

17  them atypical of the class.  Plaintiffs ███████████████████ "day traded" in

18  reliance on "daily market volatility" rather than on the "company's financial

19  statements[.]"  *Eichenholtz v. Verifone Holdings, Inc.*, 2008 U.S. Dist. LEXIS

20  64633, at *35-36 (N.D. Cal. Aug. 22, 2008) (rejecting lead plaintiff candidate who

21  engaged in day trading); *Applestein v. Medivation, Inc.*, 2010 U.S. Dist. LEXIS

22  98255, at *9 (N.D. Cal. Sept. 17, 2010) (same).  As *Eichenholtz* explained, because

23  the "class's damages stem from reliance upon the company's financial statements,"

24  class representatives who day trade may be "subject to a unique defense regarding

25  [their] reliance upon publicly traded information."  2008 U.S. Dist. LEXIS 64633, at

26  *36.

27  ████████████████████████████████████████████████████

28  ████████████████████████████████████████████████████

1  ███████████████████████████████████████ Tilahun Tr. at

2  79:21-81:17; *see also* Melgoza Tr. at 63:14-64:10, 68:13-69:18 ████████

3  ████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████

7  ███████████ Dukes Tr. at 129:3-133:14, 135:21-136:11 █████████

8  ███████████████████████████████████████████████████; *see*

9  ECF No. 219-2; *see also* Tilahun Tr. at 110:20-25. ████████████

10  ████████████████████████████████████████

11  Dukes Tr. at 203:25-205:11.  Similar short sales led to the disqualification of the

12  two lead plaintiffs in *In re Terayon Commc'ns Sys., Inc. Sec. Litig.*, because short

13  sales rendered them atypical of the class.  2004 U.S. Dist. LEXIS 3131, at *21-25

14  (N.D. Cal. Feb. 23, 2004).

15  Similarly, Plaintiffs Butler and Dukes are atypical because they are in-and-out

16  traders.  *See* ECF No. 219-2.  As Plaintiffs themselves argued, in-and-out traders

17  "d[o] not hold any Snap stock at the time of the final corrective event," and, as a

18  result, they "'cannot establish loss causation' for every corrective disclosure in this

19  litigation."  ECF No. 241 at 8-9.  For this reason, the Court previously declined to

20  appoint NMSIC lead plaintiff—even though its losses were larger than Plaintiffs'—

21  because its in-and-out trading "subject[s] [it] to the unique defense that [it] cannot

22  prove loss causation."  ECF No. 262 at 5 (citing *In re IMAX Sec. Litig.*, 272 F.R.D.

23  138, 155 (S.D.N.Y. 2010)); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d

24  29, 40 (2d Cir. 2009) ("Plaintiffs have not presented sufficient evidence to

25  demonstrate that the in-and-out traders will even 'conceivably' be able to prove loss

26  causation as a matter of law").

27  Second, at their depositions, multiple putative class representatives admitted

28  that when buying their stock, they did not rely on the alleged misrepresentations or

omissions—and in fact had not reviewed any of Snap's SEC filings.  *See Salsitz v.*
*Peltz*, 210 F.R.D. 95, 98 (S.D.N.Y. 2002) (finding class representative atypical
where he "himself admits that he did not rely on the allegedly misleading tender
offer materials").  ███████████████████████████████████████████████████
███████████████████████████████████████████████████  Dukes
Tr. at 269:3-23; Butler Tr. at 143:22-145:2, 147:2-148:6; Nelson Tr. at 154:22-
155:19; Tilahun Tr. at 126:21-127:8; Allen Tr. at 79:11-20, 84:21-85:8.  ███████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████  Butler Tr. at
143:22-145:2, 147:2-148:6; Nelson Tr. at 154:22-155:19.  ███████████████████
███████████████████████████████████████████████████
███████████████████████████  Dandridge Tr. at 91:2-6.  ████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████  Dukes Tr. at 218:22-219:4, 277:12-278:13,
287:25-291:7, 296:16-299:9.  ██████████████████████████████████████████
███████████████████████████████████████████████████
*Id.* at 300:9-301:21.  These admissions render Plaintiffs atypical of the proposed
class.

**B.     The Proposed Class Representatives Have Abdicated Leadership of the Class to Lead Counsel**

In addition to being at odds with the class they seek to represent, Plaintiffs
have abdicated leadership of the class to their counsel.  This Court has already
rejected counsel's attempt to control the litigation by substituting Messrs. Allen and
Dandridge for Mr. DiBiase, when the latter suddenly withdrew on the eve of his
deposition.  ECF No. 208.  This action nonetheless remains lawyer-driven.

Despite not seeking to be appointed Lead Plaintiffs by this Court, Messrs.

1  Dandridge and Allen are back, again seeking to serve as class representatives.

2  Mot. at 11. █████████████████████████████████████████

3  █████████████████████████████████ Dukes Tr. at 222:16-25;

4  Tilahun Tr. at 190:15-21; Melgoza Tr. at 181:1-14; Butler Tr. at 153:16-154:23;

5  Nelson Tr. at 131:15-18. ██████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████████████████████ Tilahun

8  Tr. at 160:25-162:22; Melgoza Tr. at 194:24-196:6; Butler Tr. at 164:6-165:21;

9  Nelson Tr. at 121:20-123:19; Dandridge Tr. at 152:14-153:24; Allen Tr. at 158:7-

10  160:19; Dukes Tr. at 234:14-235:10. █████████████████

11  ████  Nelson Tr. at 202:6-203:10; Allen Tr. 173:3-174:24; Dandridge Tr. at 159:3-

12  160:2; Dukes Tr. at 248:4-19, 328:4-20. ███████████████████

13  ████████████████████████████████████████

14  ███████████████████████████ Dukes Tr. at 250:3-

15  252:4, 252:19-256:14. ████████████████████████

16  █████████████████████████████████████████

17  ████  Butler Tr. at 179:6-180:1.  By these plain admissions, Plaintiffs have

18  clearly "abdicat[ed] their role as fiduciaries for the class to their attorneys."

19  *Quarterdeck*, 1993 U.S. Dist. LEXIS 19806, at *17-18 (plaintiffs were inadequate

20  where they "relied on investigations by counsel" and left "conduct of the litigation

21  to . . . attorneys").

22  **CONCLUSION**

23  For each of the foregoing reasons, the Court should deny class certification.

24  Dated:  July 12, 2019          WILSON SONSINI GOODRICH & ROSATI

25  Professional Corporation

26  By:  /s/ Boris Feldman

Boris Feldman

27

28  *Attorneys for Defendants*